THE HATTIS ASSOCIATES, INC., Plaintiff-Appellee, *v.* METRO SPORTS INCORPORATED *et al.,* Defendants-Appellants.

(No. 61401; 

First District (4th Division)—November 12, 1975.

William A. Cromartie, Robert W. Patterson, and Frank P. Vanderploeg, all of Hopkins, Sutter, Mulroy, Davis & Cromartie, of Chicago, for appellants.

Don R. Roin and Samuel M. Baker, both of Abrahams, Chapman & Roin, of Chicago, for appellee.

Mr. JUSTICE ADESKO delivered the opinion of the court:

This appeal is from a court order striking and dismissing defendant's affirmative defenses and counterclaim and granting a partial summary judgment in favor of plaintiff. The issue presented for review is whether the contract between plaintiff, Hattis, and defendant, Metro, violated the Illinois Architectural Act. Ill. Rev. Stat. 1971, ch. 10½, par. 3.

Metro, a Delaware corporation, was incorporated in January, 1972, to build and operate sports complexes in the Chicago area. One such project was an ice hockey rink at the Randhurst Shopping Center in Mt. Prospect, Illinois. On January 17, 1972, Metro, the owner, and Hattis, the architect, an Illinois corporation, executed a "Standard Form of Agreement Between Owner and Architect," the legality and validity of which is the subject of this appeal. The agreement in question was signed by Michael F. Stearn, a licensed professional engineer in Illinois, for Hattis and by Daniel C. Bryant, a licensed architect in Illinois, for Metro. At the time of the agreement, Stearn was a vice-president of Hattis. Bryant was an officer-director of Metro as well as the head of the architectural division and vice-president of Hattis. The agreement provided that basic architectural services were to be performed by Hattis. Should the owner authorize additional architectural services, the principal, Bernard S. Hattis, was to be paid at a fixed rate and employees' time (including that of architects) was to be computed at a fixed rate. Bernard S. Hattis was a licensed professional engineer at the time of the agreement and was not a licensed architect.

Metro paid Hattis $80,291.03 for services allegedly rendered by Hattis pursuant to the architectural agreement. Metro, however, believed that the plans supplied by Hattis called for a large number of additional details Metro neither desired nor could afford, and therefore, Metro terminated the architectural agreement. Hattis filed a mechanics' lien for $15,293.53 against the property occupied by the Randhurst Ice Arena, an amount representing the alleged balance due for services allegedly rendered by Hattis pursuant to the architectural agreement. Hattis then filed two complaints containing a total of five counts, three of which are based on the validity of the architectural agreement. A chancery complaint sought to foreclose the mechanics' lien. A law complaint contained a count for damages to Hattis from Metro's alleged breach of the architectural agreement and a count for actual and punitive damages against J. Emil Anderson and Son, Inc., and its president, A. Harold Anderson, a financier of Metro, for alleged tortious interference with the architectural agreement.

All defendants filed answers. Included therein was the affirmative defense that the execution and alleged performance of the architectural agreement was in violation of the Illinois Architectural Act and therefore illegal. Metro counterclaimed, seeking recovery of the $80,291.03 it had paid Hattis. Hattis' reply to the affirmative defenses denied that the architectural agreement was illegal and void. Hattis further moved to strike and dismiss the counterclaim on the grounds that it failed to

state a cause of action. The trial court granted Hattis' motion as to the affirmative defenses and counterclaim.

Defendant Metro contends that the court erred in granting plaintiff's motion to dismiss in that the architectural agreement was made in violation of the Illinois Architectural Act and, as such, is illegal, void, and unenforceable.

The Illinois Architectural Act (Ill. Rev. Stat. 1971, ch. 10½, par. 3) provides in pertinent part:

> "[I]t shall be lawful for a stock company or a corporation to prepare drawings, plans and specifications for buildings and structures as defined in this Act which are constructed, erected, built, or their construction supervised by such stock company or corporation, provided that the chief executive officer or managing agent of such stock company or corporation in the State of Illinois shall be a registered architect under this Act, and provided further that the supervision of such buildings and structures shall be under the personal supervision of said registered architect and that such drawings, plans and specifications shall be prepared under the personal direction and supervision of such registered architect and bear the stamp of his official seal."

The Act authorizes corporations to perform certain acts provided that certain corporate officials are registered architects at the time of performance. (*Continental Paper Grading Co. v. Fisher* (1954), 3 Ill.App.2d 118, 120 N.E.2d 577.) *Fisher* held that a contract is valid if at the time of making the chief executive officer or officers, whether he or they be president or vice-president, or the managing agent or agents is or are registered architects. The rationale behind such a requirement is that the architect owes a duty of loyalty to his client. The client, not the corporation, must be first. The statute was not intended to protect architects by limiting the work to licensed architects. Rather, its real purpose was to protect the public from damage caused by the work of incompetent and unlicensed architects. *People ex rel. the State Board of Examiners of Architects v. Rodgers Co.* (1917), 277 Ill. 151, 115 N.E. 146.

■■ In the case at bar, Daniel C. Bryant, a licensed architect, was a vice-president of Hattis and the head of its architectural division at the time of the agreement's making. Raymond W. Knoeppel, a licensed architect, was the head of Hattis' architectural division at the time of performance. There is no contention in the instant case that the architects who performed the work were incompetent. Metro did not reply to the May 29, 1974, affidavit of Bernard S. Hattis that Daniel C. Bryant was a vice-president of Hattis and the managing agent of the architectural division

of Hattis on January 17, 1972, the date of the agreement's making. Bryant was also a vice-president of Metro and signed the agreement in question for Metro. Knowledge of his association with Hattis was not withheld from Bryant's fellow Metro directors. We see no danger to the public under the facts of the instant case. We are of the opinion Bryant, a licensed architect, was a vice-president under the *Fisher* case sufficient to meet the requirement of the Illinois Architectural Act for a managing agent.

Further requirements exist under the Act. Such drawings, plans, and specifications shall be prepared under the personal direction of such registered architect. The said registered architect shall personally supervise such buildings and structures. Defendant Metro cites *Keenan v. Tuma* (1926), 240 Ill.App. 448, in support of its contention that a contract in violation of the Illinois Architectural Act is unenforceable. In that case the plaintiff had been in the business of engineer and architect and had entered an architectural agreement to make certain structural alterations in a building for installation of restaurant and cafeteria equipment. Plaintiff was not a licensed architect, but employed licensed architects. Licensed architects planned the work, but the unlicensed plaintiff supervised the work and undertook the practice of architecture in direct violation of the statute.

In the instant case licensed architects, first Bryant and then Knoeppel, planned and supervised the work in question. The work was not supervised by an unlicensed individual as was the case in *Keenan*. Defendant Metro signed the agreement with Hattis expecting that a licensed architect would plan and supervise the work. At the time of the agreement Hattis had an architectural division of four licensed architects headed by Bryant. Licensed architects in fact did the work. This court concludes, therefore, that the agreement met the requirements of the Illinois Architectural Act as to preparation and supervision by a licensed architect and managing agent of Hattis.

Metro contends that "Architect's Additional Services" were to be performed specifically by Bernard S. Hattis, an unlicensed architect, as principal. In *Urban Investment and Development Co. v. Maurice L. Rothschild & Co.* (1975), 25 Ill.App.3d 546, 323 N.E.2d 588, the court looked beyond the form of the lease in question to its substance. The nature of the transaction, the language employed, and all the circumstances of the case contribute to the substance of the transaction. Furthermore, an unlicensed corporation may contract to provide services by licensed individuals. (*People ex rel. the State Board of Examiners of Architects v. Rodgers Co.* (1917), 277 Ill. 151, 115 N.E. 146; *Pascal P. Paddock, Inc. v. Glennon* (1964), 32 Ill.2d 51, 203 N.E.2d 421.) The

purpose of the Illinois Architectural Act is not to provide work for licensed architects. Rather, the Act protects the public against damages from the work of incompetent and unlicensed architects.

■■ In the case at bar, a standard form architectural agreement was used. Defendant Metro does not deny that engineering work, as well as architectural work, was to be performed. A refrigeration plant, for example, is an engineering project requiring the services of a licensed professional engineer. Bernard S. Hattis was a licensed professional engineer and not a licensed architect. Daniel C. Bryant was a licensed architect and the head of Hattis' architectural division, facts known by the directors of Metro. We do not construe the Hattis-Metro architectural agreement to call for personal architectural services by Bernard S. Hattis. Rather, the nature of the transaction, the language employed, and all the circumstances of the case point to architectural services rendered by licensed architects. We find no violation of the Illinois Architectural Act. The agreement in question resulted in a legal contract binding on both Hattis and Metro.

There being no unresolved issues of fact, and Hattis having performed its side of the contract, we find that the trial court properly sustained plaintiff's motion to strike and dismiss defendants' affirmative defenses and Metro's counterclaim.

Order affirmed.

DIERINGER, P. J., and BURMAN, J., concur.