408 So.2d 229 (1981)
Ernest L. ROLLS, Samuel A. Sardinia, and Slip-Form International, Ltd., Appellants,
v.
BLISS & NYITRAY, INC., and Cory DeVries, Appellees.
Nos. 80-82, 80-260.
District Court of Appeal of Florida, Third District.
November 3, 1981.
On Rehearings February 5, 1982.
*230 William A. Ingraham, Jr. and Bertram A. Sapurstein, Buchbinder & Elegant and Harris Buchbinder, Miami, for appellants.
Floyd, Pearson, Stewart, Richman, Greer & Weil and Bertha Claire Lee and Gerald F. Richman, Miami, for appellees.
Before HENDRY, SCHWARTZ and FERGUSON, JJ.
HENDRY, Judge.
This is a consolidated appeal from a final judgment and an order taxing costs entered against appellants, defendants in the Circuit Court. Plaintiffs, appellees herein, brought suit seeking relief for breach of contract and fraud stemming from what may be characterized simply as a dispute between architects and builders engaged in an overseas construction project. The trial court, sitting without a jury, found for plaintiffs on the fraud count and assessed compensatory and punitive damages against defendants. Contractual relief was denied plaintiffs, however, the court holding that the Florida architect-licensing statute operated to bar this cause of action due to the fact that plaintiff Cory DeVries was not licensed as an architect in this state. We find error in the denial of plaintiffs' contractual remedy and further find that *231 error was committed in awarding damages based on plaintiffs' cause of action for fraud. We therefore reverse the final judgment and remand for entry of judgment on the contract in accordance with the views expressed herein.
Plaintiff Bliss & Nyitray, Inc., a local engineering firm, was searching for work outside of the United States during the "building crunch" of 1974-75. Robert Monroe, a previous acquaintance of Nyitray, contacted Nyitray concerning some construction projects in Algeria. (Monroe is not a party to this action; he was an expert in the slip-form method of construction, and later became President of defendant Slip-Form International, Ltd.) They discussed modifying certain designs to the slip-form method. Nyitray agreed to assist in finding an architect who spoke French and understood the metric system and European techniques useful in Algeria. He introduced Cory DeVries, an architect with these qualifications, and who was licensed in the Bahamas and several other foreign countries, to Monroe. DeVries worked with Monroe and prepared some preliminary plans. Bliss & Nyitray reviewed these plans for structural applications before Monroe returned to Algeria to conduct negotiations.
Monroe began to arrange with So. Tra. Wa., an agency of the Algerian government for a contract to build a low cost government housing project  the "Bainem project"  of some 400 residential units for approximately six million dollars. Monroe sought financial backing from defendants Ernest Rolls and Samuel Sardinia, and introduced them to Nyitray in late 1975. Sardinia arranged for a company in which he was part-owner to invest in the corporation to be formed and Rolls contributed his own capital. Sardinia and Rolls incorporated Slip-form International, Ltd. in Washington, D.C. on February 5, 1976.
On July 7, 1976, plaintiffs Bliss & Nyitray, Inc. and Cory DeVries as a joint venture contracted with Slip-form to perform the design phase of the Bainem project for $150,000. This contract was executed by DeVries, "Architect", and Bliss & Nyitray, Inc., "Engineers", jointly termed "Architect". It provided for DeVries to immediately begin preparation of the architectural portion of the contract documents, which involved adaptation of plans prepared by an Italian architectural firm to the slip-form technique. This work was to continue for four weeks, at which time, if no agreement had been executed between So. Tra. Wa. and Slip-form, DeVries could terminate work. An initial payment of $30,000 provided in the contract was to be made at the time of execution of an agreement between Slip-form and So. Tra. Wa., at which time the subject contract would automatically go into effect. Further payments were to be made, and portions of the plans were to be completed, within specified periods from the time at which the contract became effective. The contract additionally provided for arbitration of disputes arising therefrom, and that the governing law would be that of the principal place of business of the "Architect". (The office of the "Architect" is described in the contract as being in Miami Beach, Florida, the location of the Bliss & Nyitray firm.) Provisions were also included for interest and attorneys' fees in connection with non-payment of any sums due the "Architect" under the contract.
Since Slip-form did not execute a contract with So. Tra. Wa. within the four week period, DeVries stopped work. (An agreement between Slip-form and So. Tra. Wa. was later executed in March, 1977, and went into effect in December, 1977.) However, plaintiffs were persuaded by Monroe to continue preparation of the plans so that he could submit the 25 percent completed portion of the design phase to So. Tra. Wa., and two payments totalling $11,000 were made to plaintiffs in September and December, 1976. The 25 percent portion of the plans was submitted to Monroe in December, 1976.
By an addendum dated February 24, 1977 to their contract, plaintiffs and Slip-form, by Monroe as President, agreed to changes in the payment schedule tied to revised dates for submission and acceptance of each phase  25%, 50%, 75%, 100%  of the plans. *232 Testimony of plaintiffs indicated that they entered into the Addendum pursuant to Monroe's oral representations that they would be paid from monies Slip-form received from So. Tra. Wa., which payments were to be made on receipt and acceptance of 25%, 50%, 75% and 100% of the design plans.
In late March, 1977, Nyitray and DeVries personally delivered the 50% completed plans to Slip-form in Algeria. However, plaintiffs did not receive the $40,000 payment provided in the Addendum for this portion of the plans, and made continual demands for payment. Although testimony appears conflicting, Nyitray testified he was told by defendant Rolls that plaintiffs would receive the $40,000 as soon as Slip-form received a second payment from So. Tra. Wa. Plaintiffs continued to prepare the 75% portion of the plans while demanding payments due. Rolls authorized payment of an additional $5,000 on account. DeVries went to Algeria near the end of April, 1977, to deliver the 75% portion pursuant to the Addendum. He delivered the plans based on Monroe's representations to Nyitray that the second payment from So. Tra. Wa. was being expedited and plaintiffs would receive the $40,000 as soon as the monies arrived from Algeria.
At a meeting held June 15, 1977, between plaintiffs, Monroe and Rolls (testimony was conflicting as to whether Sardinia was also present), plaintiffs advised that the plans were nearing completion but would not be submitted until payment was received. According to Nyitray's testimony, Monroe and Rolls denied having received any monies from So. Tra. Wa. in May and said that same had been "lost" at the Chase Manhattan Bank. Plaintiffs received two $5,000 payments as a result of this meeting.
On July 2, 1977, DeVries delivered the 100% completed plans to Slip-form in Algeria. Plaintiffs learned at the end of July from So. Tra. Wa.'s former agency-head that all payments due Slip-form had been made, but were unable to reconfirm this information.
In late August or early September plaintiffs received a copy of a letter from C.T.C., an Algerian government agency with final approval authority for the project, requesting revisions to the 100% plans, which they then undertook to make. Plaintiffs met with defendants in September and discussed the revisions, as well as Slip-form's failure to make payments required by the contract and Addendum. Although contradicted by Sardinia's testimony, Nyitray testified that Sardinia denied Slip-form had received certain payments from So. Tra. Wa. Plaintiffs requested that Sardinia and Rolls personally guarantee payment before they would release the final revised plans. This guarantee was refused.
Plaintiffs did succeed, however, in obtaining another addendum agreement, dated September 30, 1977, and signed by Sardinia as Vice-President of Slip-form, which provided that Slip-form would pay $5,000 on receipt of "their next payment on account Bainem project, but no later than November 1, 1977," and payment in full according to the terms of the contract immediately on receipt of the final payment from So. Tra. Wa. for the design phase. (This final payment was due Slip-form 30 days from obtaining C.T.C. approval for the structural plans.) Nyitray testified that had he known that Slip-form had already received and spent the second and third payments from So. Tra. Wa., totalling some $300,000, they would not have delivered the completed, revised plans. (Plaintiffs received only the $5,000 payment.)
In mid-December, 1977, Slip-form transmitted to plaintiffs a letter from C.T.C. requesting more information as to a product specified in the plans, to which plaintiffs responded directly. In late January, 1978, the Algerian government agency wrote Slip-form, approving plaintiffs' suggestions subject to testing which was the responsibility of Slip-form. Plaintiffs had at this time fully performed their part of the subject contracts.
In mid-February, 1978, Rolls and Sardinia met with Nyitray and informed him of final approval subject to testing and sought his *233 advice regarding conducting the tests, which he gave them. They then stated for the first time that the second and third payments from So. Tra. Wa. had been received in May and July, 1977, but stated by way of explanation that Monroe had taken the monies to Switzerland. (Monroe resigned from Slip-form in February, 1978.)
On March 30, 1978, plaintiffs billed the defendants for the sum of $95,868.96, representing the balance due on the contract, plus amounts for extra work in connection with revisions, and interest. Plaintiffs filed suit on July 7, 1978, with counts seeking, inter alia, recovery on the contract, compensatory and punitive damages for fraud, and to pierce the corporate veil. Slip-form's answer set forth as an affirmative defense the contractual provision for arbitration and, further, counterclaimed for compensatory damages of one million dollars and punitive damages of five million dollars based on the alleged failure of plaintiffs to perform under the contract. The answer of defendants Rolls and Sardinia also raised the affirmative defense of arbitration.
Plaintiffs learned through discovery that Slip-form had received the second and third payments due from So. Tra. Wa., two payments of about $145,000 each having been credited to Slip-form's Chase Manhattan Bank account in May and July, 1977. The first payment was transferred the following day by Rolls' and Sardinia's joint signatures to Slip-form's Jacksonville, Florida bank account. The second payment was drawn against by a check written by Rolls and Sardinia to a New York law firm for $140,000, for one of Sardinia's companies.
The cause came on for jury trial, but it was stipulated that it would proceed non-jury after the court suggested this alternative, due to the impossibility of completing the trial within the time frame of one week for which it had initially been set, and for which the jurors had been empanelled.
Final judgment was entered on October 31, 1979, and included provisions which we summarize, as follows:
`Plaintiffs were precluded from recovery on their contract against Slip-form due to the failure of plaintiff Cory DeVries to be registered as an architect in accordance with Chapter 467, Florida Statutes [1977]; however, in the event of reversal on appeal as to this issue, plaintiffs would be entitled to recover the sum of $95,868.96 plus interest, costs and attorneys' fees;
Plaintiffs met the burden of proving fraud by the individual defendants and were entitled to recover compensatory damages on this count in the sum of $9,750 against defendants, jointly and severally, in addition to punitive damages of $10,000 against Rolls and $50,000 against Sardinia;
Defendant Slip-form would take nothing on its counterclaim against plaintiffs.'
On January 10, 1980, the court entered its order and final judgment taxing costs against all defendants jointly and severally in the amount of $2,431.15.
Defendants appeal the adverse final judgment imposing compensatory and punitive damages based on a theory of fraud. They also appeal the order and final judgment taxing costs against them. These appeals were consolidated by order of this court. Plaintiffs cross-appeal from the final judgment insofar as it denied their contract recovery based on application of Chapter 467, Florida Statutes (1977), and awarded inadequate compensatory damages. They also cross-appeal from the order taxing costs against defendants.
We first address the holding that the statute in question constitutes a bar to plaintiffs' purely contractual remedy. The statute in question, former Chapter 467, Florida Statutes (1977), entitled "Architects,"[1] is a type of professional regulation *234 statute commonly enacted by the states to govern the conduct of certain persons whose occupations are said to affect the public interest, such as e.g., contractors, pharmacists, C.P.A.'s, teachers, pawnbrokers, insurance agents, cosmetologists, funeral directors, engineers and architects. 53 C.J.S. Licenses § 30 at 563-64.
In reviewing the applicability of this statute to the facts sub judice we first recognize the controlling legal principle, successfully urged by appellants at trial, that contracts which are made in violation of such professional regulation statutes are generally held to be invalid and unenforceable at law. 51 Am.Jur.2d Licenses and Permits § 66 at 72; 53 C.J.S. Licenses § 59 at 711; 15 Williston on Contracts, 3d ed., § 1766 at 256-58.
The reasoning behind this rule is explained in 5 Am.Jur.2d Architects § 4:
As in the case of professional and occupational licenses generally, the effect of the failure of an architect or one holding himself out as an architect to procure a license to practice his profession on the validity and enforceability of a contract for his services or upon his right to recover for services rendered depends, in the main, upon the purpose of the legislature in requiring the license. If the purpose in requiring the license is to furnish protection to the public by preventing incompetent persons from assuming to act in that particular capacity, the contract of an unlicensed person is invalid. Accordingly, the rule has been laid down that the failure of one holding himself out as an architect to procure a license required for public protection and to bar those lacking in the requisites of learning and skill precludes recovery for professional services rendered in his capacity as an architect.
5 Am.Jur.2d Architects § 4 at 666 (citations omitted). Case law from the several states bears out the rule that non-licensed architects are barred from recovery on agreements to perform services which pursuant to law they are not licensed to perform. Hedla v. McCool, 476 F.2d 1223 (9th Cir.1973); Food Management, Inc. v. Blue Ribbon Beef Pack, Inc., 413 F.2d 716 (8th Cir.1969); Dalton, Dalton, Little, Inc. v. Mirandi, 412 F. Supp. 1001 (D.N.J. 1976); Jary v. Emmett, 234 So.2d 530 (La. 3d Cir.Ct.App.), writ refused, 236 So.2d 502 (La. 1970). Florida courts have recognized the rule as it pertains to the practice of various regulated professions, see, e.g., D & L Harrod, Inc. v. U.S. Precast Corp., 322 So.2d 630 (Fla. 3d DCA 1975) (carrier); Edwards v. Trulis, 212 So.2d 893 (Fla. 1st DCA 1968) (stock broker), and as to the practice of architecture, see, Gaisford v. Neuschatz, 201 So.2d 635 (Fla. 4th DCA), cert. denied, 207 So.2d 689 (Fla. 1967) (implicitly recognizing that a contract made in violation of Chapter 467 would be unenforceable, but finding plaintiff's activity an isolated transaction not constituting the practice of architecture so as to bring into play the rule). Additionally, we note that statutes which, like Chapter 467,[2] impose a penalty on the unlicensed practice rather than an explicit prohibition on the making or performance of these "illegal" bargains, have been applied to bar contractual recovery. As stated in 6A Corbin on Contracts § 1513:
[T]he legislature may prohibit the carrying on of a specified business or profession without first obtaining a license, permit, or certificate from some examining or inspecting officer or board of officers. In such a case, the carrying on of the business or profession may involve the making and performance of bargains of various kinds; and the courts have declared in innumerable cases that *235 the bargains before them were made illegal because the requirement of the license or certificate was not complied with by one of the bargaining parties.
6A Corbin on Contracts § 1513 at 722-23. See generally 51 Am.Jur.2d Licenses and Permits § 66 at 72-73.
Having examined the rule and its pertinence to the statute under consideration, we now state our conclusion that the rule may not be invoked to bar plaintiffs' recovery in the instant case. We begin by noting that the facts under which Chapter 467 has been applied to bar plaintiffs' contractual recovery here are, so far as we have been able to discover, without precedent in the law. No reported decision has turned on the question of whether architectural services whose end result is a building located outside of the regulating state can be said to fall within the statutory prescription against "practicing architecture in this state,"[3] so as to deny recovery on a contract  admittedly entered into within the state  under the principle discussed supra. We are guided, however, by certain rules of statutory construction and interpretation, as well as substantive law relating to the limits constitutionally placed on the states' powers to enact legislation as an exercise of their police powers.
Although the statute in question contains no statement of its purpose, it is clearly such a "police powers" measure. In reaching this determination we have examined judicial construction as to the purposes of similar statutes of other states,[4] which constructions demonstrate that the powers exercised in these acts are "police powers."[5] We have also been instructed as to the intended purpose of the statute by reference to the statement of purpose contained in the current statute,[6] which provides:
§ 481.201 Purpose.  The Legislature finds that improper design and improper construction supervision by architects of buildings primarily designed for human habitation or use present a significant threat to the public.

§ 481.201 Fla. Stat. (1979) (emphasis supplied). Based on the foregoing, we infer that the statute in question has as its main object the protection of the public, or in other words, that the authority for and the limitations on the enactment stem from the state's police powers, (while an incidental taxing power basis may also be recognized in that the act requires payment of certain licensing and examination fees.)
One fundamental limitation on the state's police powers is that a state may only legislate in exercise of its sovereignty-based *236 powers within its own boundaries, or at least so that the effects of the law are felt there. As stated in an excerpt from 81A C.J.S. States § 17:
[E]very state possesses exclusive jurisdiction and sovereignty over persons and property within its territory. Conversely, the jurisdiction of a state is restricted to its own territorial limits and does not extend beyond its boundaries ... A state may create legal liabilities against an absent person whose conduct produces consequences within its borders which it forbids;[7] and a state may validly regulate activities, persons and property within in its jurisdiction, although extraterritorial repercussions ensue, provided such regulation is vital to the welfare of its inhabitants, as the propriety of regulation is determined by its focus on internal problems, not by the range of its influence.
81A C.J.S. States § 17 at 297-98.
If we construe the statute so as to effectuate a valid purpose, it is clear that it may be applied extraterritorially (as against an architect who resides outside of the state) only when this application "is vital to the welfare of its inhabitants." To paraphrase the purpose contained in our current statute, inserting this limitation, the clear intent of Chapter 467 Florida Statutes (1977), and its successor, Chapter 481, Part I, Florida Statutes (1979), is to: "protect the public from the significant threat presented by improper design and improper construction supervision by architects of buildings primarily designed for human habitation or use [in the State of Florida.]" Or to put it another way, the prohibited activity, the "practice of architecture in this state" by an unlicensed architect, [§ 467.17 Fla. Stat. (1977)], contemplates the "rendering or offering to render services in connection with the design and [with the] construction [in the State of Florida] of a structure or group of structures which have as their principal purpose human habitation or use, and the utilization of space within and surrounding such structures..." [§ 481.203(6) Fla. Stat. (1979).]
In further support of our interpretation, we find persuasive the analysis applied by a federal court in the case of Dalton, Dalton, Little, Inc. v. Mirandi, 412 F. Supp. 1001 (D.N.J. 1976). The court considered the question of whether the New Jersey architect-licensing statute would bar recovery on a contract made by an out-of-state architect for services in connection with a building to be built in New Jersey and reasoned that it would, as follows:
Land is regarded in law as unique, sui generis, and always subject to local law. The rendering of professional services for the construction of a permanent building has such a firm nexus to land as to invest it with the same local character. This is because the building becomes part of the land, and therefore, its proper design is inevitably subject to local regulation at all levels. A contract to prepare plans and specifications for a New Jersey building can only be made by an architect licensed by New Jersey, or by a professional corporation formed under its laws. When made by others, the contract is illegal.
412 F. Supp. at 1004-05 (emphasis supplied).
In reaching our conclusion that the statute should not be applied to preclude plaintiffs' recovery in the case at bar since the object of the bargained-for services was a building to be constructed outside of the borders of the state, we have kept in mind the rule that "a statute should not be construed so as to bring unreasonable or absurd consequences when, considered as a whole, the statute is fairly subject to another construction that will aid in accomplishing the manifest intent and purposes designed." Leach v. State, 293 So.2d 77, 78 (Fla. 1st DCA 1974); State ex rel. Register v. Safer, 368 So.2d 620 (Fla. 1st DCA 1979).
For the reasons set forth herein, and based upon the authorities cited, we reverse the holding of the trial court insofar as the *237 denial of contractual recovery is concerned and remand for entry of judgment in favor of appellees in the amount found by the trial court to be the proper measure of damages should they be allowed to recover on the contract, to-wit: $95,868.96 plus interest, costs and attorneys' fees. Recovery of contract damages in this amount is in conformity with the "guiding principle in determining proper elements of damage in an action for breach of contract...[:] just compensation; placing the injured party in as advantageous a position as he would have occupied had his contract not been broken." Popwell v. Abel, 226 So.2d 418, 422 (Fla. 4th DCA 1979); Juvenile Diabetes Research Foundation v. Rievman, 370 So.2d 33 (Fla. 3d DCA 1979). In further support of the award, it may be said, based on the record before us, that the items of damages comprising this amount were "reasonably forseeable or contemplated by the parties as a result of the breach." Plantation Key Developers, Inc. v. Colonial Mortgage Co. of Indiana, Inc., 589 F.2d 164, 169 (5th Cir.1979); 13 Am.Jur.2d Building and Construction Contracts § 76 at 75.
As to the holding that plaintiffs were entitled to recover compensatory and punitive damages for fraud, it is our conclusion that this ruling constitutes reversible error. The nature and amount of any damages to plaintiffs resulting from defendants Rolls' and Sardinia's representations that they had not received payment from So. Tra. Wa. and so were unable to pay plaintiffs, were not pled or established in the record with the specificity required to sustain the awards of $9,750 compensatory damages against defendants jointly and severally and $10,000 and $50,000 punitive damages against Rolls and Sardinia, respectively. The compensatory damages for fraud which were prayed for in several counts of the complaint were identical to the measure of recovery sought in the separate count for breach of contract, i.e., that plaintiffs be compensated for the loss of their bargain in the amount of $95,868.96 plus extras, or in other words, that they be put in the position they would have occupied had defendants not breached the contract.
There is authority in Florida to support recovery of punitive damages in an action based on breach of contract where the breach is "attended by some intentional wrong, insult, abuse or gross negligence which amounts to an independent tort." Griffith v. Shamrock Village, Inc., 94 So.2d 854, 858 (Fla. 1957); Nicholas v. Miami Burglar Alarm Co., Inc., 339 So.2d 175 (Fla. 1976); Johnson v. Lasher Milling Co., Inc., 379 So.2d 1048 (Fla. 1st DCA 1980). However, it is well established that compensatory damages for fraud are an essential part of the cause of action which must be shown to sustain a judgment for punitive damages based on fraud, American Motorcycle Institute, Inc., v. Mitchell, 380 So.2d 452 (Fla. 5th DCA 1980); Hauser v. Van Zile, 269 So.2d 396 (Fla. 4th DCA 1972); 37 Am.Jur.2d Fraud and Deceit § 347 at 465-66. Furthermore, compensatory damages recovered under a contract theory may not be used as the underlying basis for an award of punitive damages under a separate tort count, American Motorcycle Institute, Inc. v. Mitchell, supra; Overseas Equipment Co., Inc. v. Aceros Arquitectonicos, 374 So.2d 537 (Fla. 3d DCA 1979).
Therefore, since plaintiffs failed to prove that they sustained compensatory damages based on a theory of fraud which were in any way separate or distinguishable from their compensatory damages based on the contract, we conclude that plaintiffs have failed to meet the strict pleading and proof requirements necessary to recover compensatory and punitive damages based on fraud, and that these damages must therefore be reversed.
One further issue has been raised which merits our attention. Appellants Rolls and Slip-form urge error in the trial court's denial of Slip-form's motion to compel arbitration pursuant to the contract and for stay pending arbitration. We cannot agree. The contract clause providing for arbitration stated that demand for same "shall be made within a reasonable time after the claim, dispute or other matter in *238 question has arisen." Slip-form filed its formal demand for arbitration, which was required by the contract, on March 19, 1979, and its motion to compel arbitration on March 21, 1979, some eight months subsequent to the filing of plaintiff's complaint herein, and after the cause had been set for trial. Furthermore, a counterclaim was asserted against plaintiffs by Slip-form and defendants actively participated in discovery against plaintiffs, thus placing the issue of waiver of the right to arbitrate, due to laches and the taking of an inconsistent position, before the trial court. Under the circumstances, it was reasonable for the court to conclude that defendants had accepted the judicial forum and waived any contractual right to arbitration. Winter v. Arvida Corp., 404 So.2d 829 (Fla. 3d DCA 1981); Lapidus v. Arlen Beach Condominium Ass'n, Inc., 394 So.2d 1103 (Fla. 3d DCA 1981); Lyons v. Krathen, 368 So.2d 906 (Fla. 3d DCA 1979), cert. denied, 378 So.2d 346 (Fla. 1979); Klosters Rederi A/S v. Arison Shipping Co., 280 So.2d 678 (Fla. 1973), cert. denied, 414 U.S. 1131, 94 S.Ct. 869, 38 L.Ed.2d 755 (1974); Bickerstaff v. Frazier, 232 So.2d 190 (Fla. 1st DCA), cert. denied, 238 So.2d 110 (Fla. 1970).
We find no error in the trial court's assessment of costs against all defendants in the amount of $2,431.15, and affirm the order taxing costs.
The final judgment is reversed insofar as it awards plaintiffs compensatory damages for fraud of $9,750 against defendants jointly and severally, and punitive damages for fraud of $10,000 against defendant Rolls and $50,000 against defendant Sardinia; and insofar as it denied plaintiffs' recovery of damages based on the contract. Plaintiffs are entitled to recover their contract damages of $95,868.96 plus interest, costs and attorneys' fees, and the cause is remanded with directions to enter judgment for said amount and items on behalf of plaintiffs.
It is unnecessary to reach the other points raised by cross-appeal in light of our decision.
Affirmed in part; reversed in part, and remanded.

ON REHEARING
HENDRY, Judge.
Following issuance of our opinion on November 3, 1981 in this cause, timely motions for rehearing were filed by the individual appellants, addressed to the language of the fourth paragraph preceding the conclusion of said opinion, wherein it is stated, "We find no error in the trial court's assessment of costs against all defendants in the amount of $2,431.15 and affirm the order taxing costs." We find that there is merit in appellants' motions. Accordingly, we grant the individual appellants' motions for rehearing and delete the portion of the original opinion set forth above.
Appellees/cross-appellants also timely filed a petition for rehearing and for clarification. We are not inclined to grant this petition, and same is hereby denied.
Except as provided herein, we adhere to our original opinion.
NOTES
[1] Chapter 467 ("Architects"), §§ 467.01-467.19 Fla. Stat. (1977), was repealed and replaced effective July 1, 1979, by a successor statute, Chapter 481, Part I ("Architecture"), §§ 481.201-481.233 Fla. Stat. (1979), which, while retaining many of the basic provisions, adds new sections including, inter alia, § 481.201 "Purpose" and § 481.203 "Definitions." Additionally, the penalty provided for the unregistered practice of architecture under the current statute is a misdemeanor of the first degree, whereas as it was a misdemeanor of the second degree under former Chapter 467.
[2] § 467.17 Fla. Stat. (1977) provides:

Penalty for Violations.  It shall be a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083, for any person to practice architecture in this state (except as exempted in s. 467.09) or to use the title "architect"... without being registered as an architect and having a certificate of registration then in force ... or to violate the provisions of this or any other law of the state relating to the registration of architects. (emphasis supplied)
[3] § 467.17 Fla. Stat. (1977) (emphasis supplied).
[4] 73 Am.Jur.2d Statutes § 166 at 370 provides:

It is a general rule of law that, where a question of statutory construction is one of novel impression, it is proper to resort to decisions of courts of other states construing statutory language which is identical or of similar import. (citations omitted)
[5] See, e.g., Wineman v. Blueprint 100, Inc., 75 Misc.2d 665, 348 N.Y.S.2d 721 (1973) (New York architect-licensing statute intended to safeguard life, health and property of "our" citizens); Markus & Nocka v. Julian Goodrich Architects, Inc., 250 A.2d 739 (1969) (underlying policy of Vermont statute to protect citizens of state from untrained, unqualified and unauthorized practitioners); Oakason v. Lisbon Valley Uranium Co., 154 F. Supp. 692 (D.Utah 1957) (Utah statutes regulating engineers and other professionals are for purpose of protecting the public); Kennoy v. Graves, 300 S.W.2d 568 (Ky. Ct. App. 1957) (Kentucky statute requiring license to practice as consulting engineer designed to protect public from being imposed on by persons not qualified to render such professional services); Dick Weatherston's Associated Mechanical Services, Inc. v. Minnesota Mutual Life Insurance Co., 257 Minn. 184, 100 N.W.2d 819 (1960) (Minnesota statute has as its purpose the public health and welfare, as well as protection of public against incompetence and fraud); Wilson v. Kealakekua Ranch, Ltd., 57 Haw. 124, 551 P.2d 525 (1976) (Hawaii statute designed to protect public from unfit and incompetent practitioners of architecture); Hattis Associates, Inc. v. Metro Sports, Inc., 339 N.E.2d 270, 34 Ill. App.3d 125 (Ill. 1st App. Dist. 1975) (Illinois architect act not intended to protect architects by limiting work to licensed architects, but rather, purpose is to protect public from damage caused by work of incompetent and unlicensed architects).
[6] As to the propriety of utilizing subsequent legislative enactments in interpreting an earlier statute, see 73 Am.Jur.2d Statutes § 178 at 380-81.
[7] E.g., occupational license statutes which penalize the practice of a profession within a state are most commonly applied against architects who are licensed and who reside elsewhere, but who perform architectural services within the regulating state.