537 So.2d 614 (1988)
JOHN BROWN AUTOMATION, INC., Previously Known As Wickman Machine Tools, Inc., Wickman Automatic Lathes, Limited, and John Brown, Plc, Appellants,
v.
Lewis J. NOBLES, Jr., d/b/a Nobles Packing Company and McHan Manufacturing Company, Inc., Appellees.
No. 87-3255.
District Court of Appeal of Florida, Second District.
December 16, 1988.
Rehearing Denied February 1, 1989.
*615 Julian Clarkson of Holland & Knight, Tallahassee, and Ned N. Julian, Jr., of Stenstrom, McIntosh, Julian, Colbert & Whigham, P.A., Sanford, for appellants.
James E. Thompson, G. Donovan Conwell, Jr., and Chris W. Altenbernd of Fowler, White Gillen, Boggs, Villareal & Banker, P.A., Tampa, for appellees.
FRANK, Judge.
This case arises from the appellants' failure to deliver in a timely fashion three machines and appropriate tooling capable of manufacturing collet nuts. The trial resulted in an extraordinary $6,000,000 punitive damage award to the appellees, together with compensatory damages totalling $2,200,000. The appellants have sought review of the judgments entered upon the jury verdicts. We reverse.
The underlying dispute in this matter has its genesis in the desire of Lewis J. Nobles, Jr., a Collier County tomato grower, to invest in an enterprise for the manufacture of collet nuts. Collet nuts are metal locking devices intended for use on agricultural and irrigation equipment. Nobles had used the collet nuts on some of his equipment, and the satisfactory results he obtained caused him to think that investment in their manufacture would prove lucrative. The collet nut had been manufactured by McHan Manufacturing Co., a corporation organized in 1982 by Nobles' friend, J.D. McHan.
By June of 1983 McHan Manufacturing had begun to have financial difficulties. Nobles initiated a series of loans to McHan which by May of 1984 amounted to a total of $570,529.51. Nobles also began negotiations to acquire a controlling stock interest in McHan Manufacturing, and in August of 1983 he purchased more than 70% of the McHan stock for a total price of $304,500.
When Nobles began investing in McHan Manufacturing it had only one old machine producing its primary product  collet nuts; its secondary product was garden hoes. Nobles and McHan agreed that it was necessary to upgrade the operation with better equipment in order to expand the collet nut business. McHan returned a reply card from a trade journal to John Brown PLC, a British holding company that at the time numbered among its wholly-owned subsidiaries John Brown, Inc., formerly known as Wickman Machine Tools, Inc., a United States Corporation, and Wickman Lathes, a British company. Wickman Machine and Wickman Lathes were members of John Brown PLC's Machine Tool Division. Wickman Lathes manufactured large multispindle automatic lathes, together with associated parts, of the type needed by McHan Manufacturing to enhance its collet nut production. John Brown, Inc. was the exclusive selling agent in the United States for the machines made by Wickman.
The card sent by McHan to John Brown PLC was ultimately forwarded to John Brown, Inc.'s southeast regional manager, George Appleby. Appleby communicated *616 with Von Plourde, John Brown, Inc.'s Florida representative, who made several calls on McHan during August and September of 1983. In late September, 1983, three purchase orders, for machines of three different sizes, were prepared naming Nobles as purchaser and specifying delivery dates, the latest of which was November, 1983. Nobles financed the purchase of these machines through a lease purchase agreement with Dresser Leasing Corporation. The total cost of the three machines was $616,815.
Soon after the machines were delivered it became apparent that John Brown had failed to furnish all the necessary tooling accessories; the machines could not produce collet nuts. Thus we have arrived at the heart of the problem spawning this extensive litigation. McHan asserted that he explained to Von Plourde that he and Nobles required immediate delivery and setup of the machines because they needed to fill contracts and orders, and they were spending large sums to fund McHan's operation. Von Plourde communicated the sense of urgency to one of John Brown's vice presidents. John Brown, Inc. represented to Nobles and McHan that the parts existed and would be forthcoming. Most of the parts were finally shipped for two of the machines by January of 1984, at which time they became functional. The third machine, however, could not produce collet nuts without a missing threadchasing attachment that was unavailable.
During the months of November and December Von Plourde was involved in extensive discussions with Nobles, McHan, and John Brown representatives about the missing parts and the need for their delivery. At the end of January, 1984, Wickman Lathes advised Von Plourde that it was withdrawing from the manufacturing of metal cutting machine tools but would continue to provide technical service and spare parts for machines supplied to North American customers. By April of 1984 McHan Manufacturing ceased operations, sold the three machines, and applied the proceeds to the Dresser lease-purchase agreement. Nobles then decided to cut his losses and he stopped financing McHan Manufacturing. In May of 1985 Nobles ceased making payments to Dresser and instituted this lawsuit.
Nobles and McHan Manufacturing sued John Brown PLC, John Brown Automation (the successor to Wickman Machine Tools, Inc.), Wickman Automatic Lathes, Dresser Leasing Corp., and V.P. Precision Equipment Corp. (the selling agent whose president is B. Von Plourde). Dresser was dropped prior to trial after achieving a settlement. The multi-count complaint was grounded upon several causes of action, among them breach of contract, breach of implied warranties, intentional misrepresentation, and negligent misrepresentation.
At trial Nobles claimed the following damages:

 Payments for McHan Manufacturing stock $304,500.00
 Loans to McHan Manufacturing 570,527.50
 Payments to Dresser Leasing 228,863.88
 Salary to Drake Doty, a McHan employee 29,116.00
 Payments due to Dresser Leasing 390,000.00
 ============
 1,523,007.38

McHan Manufacturing sought damages in the total amount of $662,658.89, representing its payroll, overhead, and related expenses. The jury, apparently rounding off the figures, awarded Nobles $1,500,000 and McHan $700,000. In addition, Nobles and McHan Manufacturing were each awarded $3,000,000 in punitive damages. V.P. Precision was found to be without fault.
John Brown has appealed on two points: first, that punitive damages are not recoverable for economic losses in a breach of contract action; second, that the trial court erroneously admitted evidence resulting in duplicative damages. We will first consider the punitive damages question.
Our consideration of this matter has included a complete review of the record, the briefs and the arguments. In the course of our deliberations we have consistently and repeatedly been returned to one salient point: when all is said and done, this is *617 essentially a breach of contract case. Nobles and McHan contracted for delivery of certain machines; the appellants failed to deliver as promised, although eventually most of the contractual duties were performed, albeit in an untimely manner.
Punitive damages for breach of contract are barred by Florida law. A legion of cases supports this proposition. E.g., AFM Corp. v. Southern Bell Telephone and Telegraph Co., 515 So.2d 180 (Fla. 1987); Florida Power & Light Co. v. Westinghouse Electric Corp., 510 So.2d 899 (Fla. 1987); Southern Bell Telephone & Telegraph Co. v. Hanft, 436 So.2d 40 (Fla. 1983); Lewis v. Guthartz, 428 So.2d 222 (Fla. 1982); Futch v. Head, 511 So.2d 314 (Fla. 1st DCA), pet. for review den., 518 So.2d 1275 (Fla. 1987); Rolls v. Bliss & Nyitray, Inc., 408 So.2d 229 (Fla. 3d DCA 1981). As these cases recognize, however, a separate and independent tort, if pleaded and proved, will support a claim for punitive damages. Nobles and McHan have steadfastly maintained that their allegations and proof of negligent misrepresentation fulfilled this criterion. We disagree.
A constant untangled thread running through all the cases involving punitive damages in the context of a contractual breach is that the tort for which such damages are recoverable must be separate and independent from the breach of contract. For example, in Rolls v. Bliss & Nyitray, Inc., the third district expressed the following:
Therefore, since plaintiffs failed to prove that they sustained compensatory damages based on a theory of fraud which were any way separate or distinguishable from their compensatory damages based on the contract, we conclude that plaintiffs have failed to meet the strict pleading and proof requirements necessary to recover compensatory and punitive damages based on fraud, and that those damages must therefore be reversed.
408 So.2d at 237 (emphasis added).
Similarly, the claim for punitive damages was rejected in Lewis v. Guthartz for the failure "to allege or prove a tort committed by Guthartz which was distinguishable from or independent of his breach of contract." 428 So.2d at 224. Furthermore, the damages sustained by that tort must be of a particular kind, as our supreme court emphasized in its recent comments in AFM Corp.: "We conclude that without some conduct resulting in personal injury or property damage, there can be no independent tort flowing from a contractual breach which would justify a tort claim solely for economic losses." 515 So.2d at 181-82.
The alleged misrepresentations on which McHan and Nobles pinned their punitive damage claims were, first, that the appellants represented that they had all machine parts on hand when in fact they did not and, second, that the appellants failed to disclose that they were going out of the machine-producing business. We frankly fail to see the importance of this second aspect of the tort liability theory; the appellants apparently intended to supply service and parts as needed. It is significant that these two allegations were the basis for both the intentional and negligent misrepresentation claims. The trial court directed a verdict against the appellees on the intentional misrepresentation count, but allowed the negligent misrepresentation count to go to the jury seemingly because the evidence showed that the appellants said they had parts but in reality they did not. After an initial refusal to do so, the trial court allowed the jury to consider the punitive damages claim, which was hanging entirely by a most tenuous filament of negligent misrepresentation.
The trial court, openly relying upon this court to sort this matter out, should have adhered to its initial impulse to dismiss the negligent misrepresentation count and the punitive damages relief. The misrepresentation ascribed to the appellants is inherent in and inextricable from the events constituting a breach of the contract. See Lake Placid Holding Co. v. Paparone, 508 So.2d 372 (Fla. 2d DCA 1987) (punitive damages stricken because alleged fraud arose from the same conduct which constituted breach of contract). The appellees contracted for machines that *618 would make collet nuts. The appellants persisted in representing that parts would be forthcoming, i.e., that they were continuing in their efforts to perform the contract. In fact the appellants did undertake action resulting in the ultimate outfitting of two of the machines. Eventually, however, they breached some of the material terms of the contract  they did not perform on time and they did not supply all the parts essential to the operation of the third machine. Thus, any economic loss sustained by Nobles and McHan arose from the breach of the contract and nothing more.
The appellees have persistently contended, however, that negligent misrepresentation is tantamount to fraud, and hence the award of punitive damages was justified. The appellees, however, have not directed us to any authority in which a negligent misrepresentation  associated with the performance of a contract  has justified an award of punitive damages. Apparently aware of the difficulty inherent in the negligent misrepresentation notion, the appellees now urge the view that the tort ascribable to the appellants  although it was not pleaded  was "fraud in the inducement." Aside from the pleading problem, we are unable to extract anything from the record to sustain a finding that by misrepresentations, negligently uttered, the appellants induced Nobles and McHan to enter a contract. Our assessment of the record in this regard is critical for the reason that well accepted precedent leaves no doubt that the mere failure to perform a promise does not constitute fraud. The result we reach would, of course, be different if the record disclosed a specific purpose in the appellants not to perform the contract at the time it was entered. See Century Properties v. Machtinger, 448 So.2d 570 (Fla. 2d DCA 1984). The appellants have adduced no evidence from which this court can discern an intent on the part of the appellants not to fulfill the contract when it was formed.
The appellees rely heavily upon First Interstate Development Corp. v. Ablanedo, 511 So.2d 536 (Fla. 1987), primarily because of the statement that "[t]he overwhelming weight of authority in this state makes it clear that proof of fraud sufficient to support compensatory damages necessarily is sufficient to create a jury question regarding punitive damages." 511 So.2d at 539. Ablanedo will not stretch as far as the appellees desire. The foregoing language is succeeded in the very next paragraph by an equally succinct and clear explanation: "This is so because intentional misconduct is a necessary element of fraud. Indeed, to prove fraud, a plaintiff must establish that the defendant made a deliberate and knowing misrepresentation designed to cause, and actually causing detrimental reliance by the plaintiff." 511 So.2d at 539 (emphasis added). The appellants' representations, even if misleading, induced in the appellees no greater reliance upon the performance of the promise to provide adequate machinery than that which occurred upon entry into the contract. In the present context, the negligent misrepresentation claim will not support an award of punitive damages and such damages are stricken.
We turn now to the remaining question for our review: whether Nobles recovered excessive compensatory damages. It is evident that the jury "rounded off" the figures Nobles presented to it and awarded him everything he sought. The most dramatic error in allowing the jury to consider all of the damage evidence concerns Nobles' loans to McHan Manufacturing and his acquisition of stock in McHan Manufacturing. Nobles' decision to invest in McHan Manufacturing was executed in June of 1983, and was entirely unrelated to the September 28, 1983 contract for the purchase of the machines. Moreover, his August, 1983, stock purchase was not bottomed "on the faith of the contract" and is not recoverable in an action for a breach of contract. Beefy Trail, Inc. v. Beefy King International, Inc., 267 So.2d 853, 856 (Fla. 4th DCA 1972). It is within our power to and we strike Nobles' claims to $304,500 and $570,527.50.
Another evident problem associated with the jury verdict stems from the fact *619 that McHan Manufacturing was awarded $700,000. The $662,658.89 McHan claimed incorporated expenses incurred by its collet nut operation before entry into the machine contract and was undifferentiated from the expenses of the garden hoe division. In sum, the trial court should have granted the appellants' motion for new trial because the jury was allowed to consider and may have been influenced by the inflated evidence of McHan's and Nobles' losses. On remand, the jury should have the opportunity accurately to assess the extent of the losses appellees sustained.
Finally, the facts we have described paint a simple picture of a business deal gone sour. The appellants have not contested their liability on appeal. Nobles and McHan deserve compensation for their losses but only to the extent that the appellants were responsible for them.
Accordingly, the judgments are reversed and the cause is remanded for a new trial solely on the issue of actual, compensatory damages arising from the appellant's breach of the contract.
RYDER, A.C.J., and LEHAN, J., concur.