ROYAL TYPEWRITER COMPANY, A DIVISION OF LITTON BUSINESS SYSTEMS, INC., a corporation, Plaintiff-Appellant,

v.

XEROGRAPHIC SUPPLIES CORPORATION, a corporation, et al., Defendants-Appellees.

No. 81–5311.

United States Court of Appeals, Eleventh Circuit.

Nov. 14, 1983.

---

Shutts & Bowen, Karl V. Hart and Phillip
J. Sheehe, Miami, Fla., Trenam, Simmons,

Kemker, Scharf, Barkin, Frye & O'Neill, Marvin Barkin, Keith E. Rounsaville, Tampa, Fla., for plaintiff-appellant.

Shelby Highsmith, Philip Glatzer, Coconut Grove, Fla., for defendants-appellees.

Before HILL and HATCHETT, Circuit Judges, and HAYNSWORTH *, Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

Plaintiff/appellant Royal Typewriter Company initiated this action on March 2, 1976 by filing a complaint against defendants/appellees Xerographic Supplies Corporation (XSC), Ted Mark, Paula Mark, and Mark Royal Associates. The complaint primarily sought to collect amounts unpaid on promissory notes and guarantees issued by appellees in payment for Royal Bond Copy Machines (RBC–I's). Appellees filed a counterclaim against Royal seeking to recover damages for alleged breaches of warranties, fraud, and tortious interference with business relations while maintaining at trial both that they could properly revoke acceptance and that Royal's action was barred by failure of consideration. After a jury trial, the district judge entered a judgment upon a jury verdict awarding appellees $1,750,000 in compensatory damages and $3,250,000 in punitive damages against Royal and denying Royal's claim against appellees for $846,607.12 owed on promissory notes and guarantees. The district court granted Royal a set-off of $12,508 against the final judgment and reduced the award to $4,987,492. Royal appeals.

The case arose from a series of separate transactions commencing in January 1973 and ending in October 1975 in which XSC purchased 193 RBC–I's, 190 of them on credit. The issues in this case arise primarily under Florida common law and under the Florida version of the Uniform Commercial Code. The issues raised by Royal on appeal include:

(1) whether a new trial is required because erroneous theories of liability and damages were submitted to the jury and a general verdict was returned;

(2) whether the district court erred in not dismissing XSC's breach of warranty claims;

(3) whether the district court erred in not dismissing appellees' fraud claims;

(4) whether the district court should have dismissed appellees' claim of tortious interference with appellees' business relationships;

(5) whether the district court properly allowed the jury to consider the issues of compensatory and punitive damages;

(6) whether XSC properly revoked acceptance of the RBC–I's; and

(7) whether appellant was entitled to a directed judgment on the promissory notes.

We reverse the district court's judgment and remand for proceedings consistent with this opinion.

## I. Facts

In 1971, Royal began to market the RBC–I, a first generation plain paper or "bond" copying machine manufactured in Japan for Royal by Konishirou. When the RBC–I was first marketed, plain paper copiers were in their infancy. The RBC–I contained features representing technical improvements over Xerox bond copiers which dominated the market at the time. The RBC–I unquestionably produced high quality copies. When viewed in light of subsequent advances in the state of the art, the RBC–I has obvious limitations. The RBC–I is slow and noisy. To eliminate these problems, some users and dealers installed speed modifications and "quiet down" kits which increased the wear on the machine.

In the early 1970's, Underwriters' Laboratories, an independent organization that tests electrical equipment, promulgated designation.

---

* Honorable Clement F. Haynsworth, Jr., U.S. Circuit Judge for the Fourth Circuit, sitting by

safety specifications for bond copiers. To obtain UL certification, the product had to be tested under UL supervision or UL audit. Royal obtained UL certification for the RBC–I before marketing it in the United States.

Ted Mark organized XSC in Miami, Florida in 1969. Mark had worked for Xerox as a sales representative from October 1966 until May 1969. During its first four years of operation, XSC primarily marketed supplies for electrostatic copiers. The company had no experience with bond copiers. In 1971, XSC hired Joseph B. Stryhal as sales manager. Mark first saw the RBC–I at a trade show in Atlanta in July 1972. Upon his return to Miami, he instructed Stryhal to study trade literature and to call existing dealers in Florida to inquire about the RBC–I. After investigation by both men, Stryhal reported to Mark that the RBC–I was "the greatest machine that is going to replace Xerox. . . ."

In 1973, Gordon Waters, then vice-president of Royal, met Mark at a trade show. Mark asserts that Waters told him that the RBC–I had been properly tested and was ready to be marketed, that the RBC–I had a useful life of one million copies calculated at the rate of 8000 copies per month, and that if XSC became an RBC–I dealer, Royal would not compete with XSC in Miami. Mark also maintains that another Royal representative, Dick Thomas, told him that it would cost XSC ½ cent per copy to service and maintain RBC–I's on a rental basis. Mark claims that other Royal representatives represented to him and Stryhal in 1972 that the RBC–I had been tested by Royal, that it was a good and reliable machine being successfully marketed, and that the machine would cost approximately ½ cent per copy to maintain.

XSC received its first RBC–I on January 13, 1973. From January 1973 through June 1975, in eleven separate transactions, XSC received from Royal 193 RBC–I's, 190 of which were purchased on credit.

The RBC–I required regular service to assure proper operation. Royal recommended that the RBC–I receive preventive maintenance every 4800 to 5000 copies, a schedule known to both Mark and Stryhal. XSC sent service people to schools provided by Royal to train dealer service personnel. XSC's records indicate, however, that on the average, XSC performed preventive maintenance on its RBC–I's every 11,000 copies. Royal's program also specified a comprehensive overhaul every 100,000 copies, called the "100,000 copy PM." XSC failed and neglected to perform any 100,000 copy PMS.

To solve the problems with noise and speed, independent RBC–I dealers invented and manufactured certain devices called "quiet down" and "speed up" kits for installation on the RBC–I. Appellees alleged that Royal assisted dealers in installing these kits. Appellees also alleged that Royal itself used the quiet down kit on its RBC–I's for demonstration at trade shows and published a newsletter in November 1973 heralding the "good news" to its dealers that these kits manufactured by private dealers were now available and telling dealers where and how to obtain them. The only proviso from Royal was that the quiet down kit had to be installed with the speed up kit. Royal simultaneously published a letter to dealers informing them that installation of unauthorized modifications would void all warranty protection attendant to its sale of RBC–I's.

XSC alleged that the RBC–I was susceptible to frequent paper jams. When paper copies became jammed in the exit or heater (fuser) section of the machine, the paper would smoke, char, burn and could catch on fire. XSC also alleged that Royal did not maintain a sufficient supply of spare parts and was aware of fire-related problems with the design of the machine itself as early as August 1971. XSC contends that it continued to purchase RBC–I's from Royal while relying on the latter's assurances that problems with spare parts would be corrected.

Appellees also complained that though Royal had represented to Mark that it would not compete with XSC as an RBC–I dealer in Miami, Royal addressed several

letters to XSC's rental customers inviting them to do business with Royal on a "straight purchase" basis and suggesting that it would be better to do business with Royal directly than with a local dealer. After the date of these letters, XSC lost at least one customer, Southeast First National Bank of Miami, which cancelled its leases of RBC–I's.

XSC claims that it did not receive notice from rental customers regarding electrical shock problems related to the potential fire hazard until January and August 1976. Appellees introduced expert witnesses, one of whom examined the machine in October 1976, who testified that the RBC–I and its component parts were substantially defective in several respects, that the RBC–I as manufactured violated UL standards, and that with its interlocks "bypassed," the RBC–I presented an electrical shock hazard to the user.

On March 2, 1976, Royal filed its complaint to recover amounts unpaid on the notes issued by appellees in payment for the RBC–I's. Royal sought to replevy the RBC–I's still in XSC's possession. On November 1, 1976, United States District Judge C. Clyde Atkins held a hearing on an order to show cause why XSC should not deliver its remaining RBC–I's. At this hearing, appellees' counsel, three weeks after filing a counterclaim against Royal, announced that XSC was "revoking acceptance" of all machines in issue based on the October 1976 inspection which revealed alleged defects in the machines. XSC also informed its customers to return their RBC–I's to Royal. Inspection of the returned machines by Royal revealed the RBC–I's to be in poor, neglected condition. Many of the machines had been used for over three years without proper maintenance. Royal claims that many machines had parts that did not meet Royal specifications and that 106 of 122 had unauthorized quiet down kits installed by XSC. XSC never returned the seventy-one machines that it had sold to customers.

## II. District Court's Use of a General Verdict

■ Each of the appellees asserted several claims against Royal including breach of express warranties, breach of an implied warranty of merchantability, breach of an implied warranty of fitness for a particular purpose, and fraud. XSC separately asserted a claim for intentional interference with XSC's business relationships. Before the jury was instructed, each side submitted proposed special interrogatories and special verdict forms to the trial judge. Appellees objected to Royal's proposed interrogatories and special verdict as being too complex. Royal objected to appellees' proposed interrogatories and special verdict as being too simplistic. The trial judge declined to use either and submitted all appellees' claims to the jury on a general verdict.

The decision to use special interrogatories or verdicts rests within the discretion of the trial court. *Jones v. Miles,* 656 F.2d 103, 106 n. 4 (5th Cir.1981); *Jamison Co. v. Westvaco Corp.,* 526 F.2d 922, 934–35 (5th Cir.1976). The law is well-settled in this circuit that if "the judge accepts a general verdict in a case containing multiple issues, the verdict is immune from attack only as long as the evidence under each count is sufficient to authorize the result." *Jones v. Miles,* 656 F.2d at 106 n. 4; *see Smith v. Southern Airways, Inc.,* 556 F.2d 1347 (5th Cir.1977).

■ Appellees urge us to apply the "two-issue rule" as adopted by the Florida courts. Under this rule, an appellate court will not grant a new trial where the jury has rendered a general verdict and the appellate court finds no error as to one of the theories on which the jury was instructed. *See Colonial Stores, Inc. v. Scarbrough,* 355 So.2d 1181, 1185–86 (Fla.1977). In diversity cases in this circuit, an appellate court applies the federal, rather than the state, standard in reviewing challenges to a general verdict. *Smith v. Southern Airways, Inc.,* 556 F.2d at 1347; *King v. Ford Motor Co.,* 597 F.2d 436, 439 (5th Cir.1979) ("In diversity cases in this circuit, a district court applies the federal, rather than the

state, standard for determining whether a party's evidence is sufficient to defeat a motion for a directed verdict or judgment n.o.v. ...; to entitle it to a new trial ... [an appellant] need only show that the evidence is insufficient to support one of the plaintiffs' theories.") (citations and footnote omitted); *but see Keet v. Service Machine Co., Inc.,* 472 F.2d 138, 140 (6th Cir. 1972) (holding state rules applicable to challenges to general verdict). We therefore hold that unless appellees can support submission of each theory of liability submitted to the jury, we must remand the case for a new trial.[1]

### III. *Implied Warranties*

■ The trial judge instructed the jury on theories of an implied warranty of merchantability and of an implied warranty of fitness for a particular purpose. We hold that appellees presented no evidence to support these instructions and that the district court erred in so instructing the jury.

In order to be merchantable under Florida law, Fla.Stat.Ann. § 672.314, the RBC–I's must have passed without objection in the trade under the contract description, be of fair average quality, and be fit for the ordinary purposes for which such goods are used.[2] The tests of merchantability are standards of minimal quality measured in accordance with the standards of the trade. *See* Florida Code Comments. Appellees assert that they presented evidence showing that the RBC–I was a fire hazard and that the machine did not conform to the stan-

dards promulgated for copier machines by Underwriters Laboratories.

■ Appellees' evidence, however, does not show that the RBC–I's failed to conform to existing standards of the trade at the time of sale. *See Royal Business Machines, Inc. v. Lorraine Corp.,* 633 F.2d 34, 46 (7th Cir.1980). The RBC–I's sold to XSC were not required to be the best copiers on the market or equal to similar or competing copiers. *See Borrell-Bigby Electrical Co. v. United Nations, Inc.,* 385 So.2d 713, 715 (Fla.App.1980); *Wisner v. Goodyear Tire & Rubber Co.,* 167 So.2d 254 (Fla.App.1964). Appellees relied heavily on a test report dated August 1971 of UBIX–600's, the machines which Royal marketed as RBC–I's, describing these machines as not ready for marketing and Royal's later performance reports. This evidence would not enable a jury to infer that the RBC–I's actually marketed were not merchantable. First, the UBIX–600's tested prior to October 1971 were never marketed. As appellant notes, the August 1971 test report stated that the machines would not be submitted to UL for approval until changes had been made. Royal obtained UL approval *before* marketing the RBC–I's. The January 1972 report, which analyzed the first production models, projected that specific adjustments would yield reliability above specification. Similarly, appellees' evidence regarding fire hazards and parts problems does not show that the RBC–I's failed to conform to then-existing standards in the trade. As both parties noted, the RBC–I was a new generation of copiers—a plain bond copier—produced in

---

1. Appellees imply that Royal waived its protection under this court's rule regarding appellate review of general verdicts by requesting special interrogatories that were "utterly lengthy, confusing and complex." Appellees' Brief at 22. We disagree. The decision whether to submit proposed special interrogatories rests within the trial judge's discretion. *See Jones v. Miles,* 656 F.2d 103, 106 (5th Cir.1981). The burden of supporting the general verdict in a case containing multiple issues rests on the appellee. *See id.*

2. Fla.Stat.Ann. § 672.314(2) provides:

 (2) Goods to be merchantable must be at least such as:

(a) Pass without objection in the trade under the contract description; and
(b) In the case of fungible goods, are of fair average quality within the description; and
(c) Are fit for the ordinary purposes for which such goods are used; and
(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
(e) Are adequately contained, packaged, and labeled as the agreement may require; and
(f) Conform to the promises or affirmations of fact made on the container or label if any.

an era of rapid technological innovation. Appellees adduced no evidence that the RBC–I's were not fit for the ordinary purposes for which copiers are used.[3]

 The trial court also erred in instructing the jury that Royal could be held liable on a theory of implied warranty of fitness for a particular purpose. Such a warranty arises where a seller has reason to know a particular purpose for which the goods are required and the buyer relies on the seller's skill or judgment to select or furnish suitable goods. Fla.Stat.Ann. § 672.315; see Royal Business Machines, Inc. v. Lorraine Corp., 633 F.2d at 46. Appellees assert that the particular purpose for which they intended to use the RBC–I's was for renting copiers to customers. We hold, as a matter of law, that leasing, as opposed to selling, copiers is not a "particular purpose" to which the protections of § 672.315 attach. A "particular purpose" differs from an ordinary purpose in that it envisages a specific use by the buyer which is peculiar to the nature of his business. See Official Comment 2 to U.C.C. § 2–315. Although XSC leased most of its RBC–I's, the contemplated use of the machines was as copiers—the ordinary purpose for which the RBC–I was sold. Since the RBC–I's were used for ordinary purposes, a warranty of fitness for a particular purpose did not arise. See Bruce v. Calhoun First National Bank, 134 Ga.App. 790, 794, 216 S.E.2d 622, 625 (1975); Recreatives, Inc. v. Myers, 67 Wis.2d 255, 226 N.W.2d 474 (1975).

Appellees argue that Royal waived its right to argue that the trial judge erred in instructing the jury on the presence of an implied warranty of fitness for a particular purpose. Appellees assert that Royal's agreement that "a contract may of course include both a warranty of merchantability and one of fitness for a particular purpose" constitutes a "stipulation" that the evidence supported claims for breach of implied warranty. This argument cannot withstand scrutiny of the statement's plain meaning, particularly in view of Royal's later objecting to injecting these issues into the case. We, therefore, conclude that the trial judge erred in instructing the jury that Royal could be held liable for breaching an implied warranty of fitness for a particular purpose.

### IV. Express Warranties

 A seller can create an express warranty by making an affirmation of fact to the buyer which relates to the goods and becomes part of the basis of the bargain between the parties. Fla.Stat.Ann. § 672.-313(1)(a). Appellees presented evidence regarding three statements which allegedly satisfied the above requirements. They were: (1) that the rental or lease of the RBC–I's would produce a profit; (2) that the RBC–I had a profitable and useful life of ten years, calculated at the rate of 8,000 copies per month (i.e. almost 1 million copies); and (3) that the maintenance factor for each RBC–I was ½ cent per copy. The Court of Appeals for the Seventh Circuit held in Royal Business Machines, Inc. v. Lorraine Corp., 633 F.2d 34, 41 (7th Cir. 1980) that

—[t]he decisive test for whether a given representation is a warranty or merely an expression of the seller's opinion is whether the seller asserts a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment.

Applying this test to the affirmations in the case at bar, we hold that Royal's statement that the rental or lease of the RBC–I's would produce a profit did not create an express warranty. Royal's statements that the RBC–I had a useful life of ten years calculated at the rate of 8000 copies per month and that the maintenance factor for

---

**3.** Our holding today does not preclude appellees from presenting evidence at the new trial that the RBC–I's did not satisfy existing industry standards at the time of sale. See Royal Business Machines, Inc. v. Lorraine Corp., 633

F.2d at 46. Specifically, appellees may show, among other things, that the fire hazard posed by the RBC–I violated industry standards and rendered the machine unmerchantable.

each RBC–I would be ½ cent per copy constitute the type of affirmations which give rise to express warranties. These statements clearly related to the goods.

■ For these affirmations to constitute express warranties, appellees must have presented evidence that the affirmations became part of the basis of the bargain. Fla.Stat.Ann. § 672.313(1)(a). Royal asserts that appellees' experience with copiers generally, their testing of a sample RBC–I prior to their first purchase of RBC–I's in 1973, their reading of available information, and their consultations with dealers, negate any inference that these affirmations formed the basis of the bargain. The requirement that a statement be part of the basis of the bargain "is essentially a reliance requirement and is inextricably intertwined with the initial determination as to whether given language may constitute an express warranty since affirmations, promises and descriptions tend to become part of the basis of the bargain." *Royal Business Machines, Inc. v. Lorraine Corp.*, 633 F.2d at 44 n. 7 (quoting *Sessa v. Riegle*, 427 F.Supp. 760, 766 (E.D.Pa.1977), *aff'd*, 568 F.2d 770 (3d Cir.1978)). The buyer's knowledge or absence of reliance will negate the existence of an express warranty. *See Carter Hawley Hale Stores, Inc. v. Conley*, 372 So.2d 965, 969 (Fla.App.1979). Appellees presented sufficient evidence from which a jury could infer that they relied on these affirmations by noting that appellees lacked prior experience with bond copiers prior to purchasing the RBC–I's.[4]

Appellees assert that Royal expressly warranted the "profitability" of the RBC–I's at a meeting in Curacao based on several "assumptions." At that meeting, Royal distributed to dealers and their representatives a document explaining the economic feasibility of marketing the RBC–I. Royal argues that the document was prepared for a

seminar which compared the tax benefits that could be realized from renting and/or selling RBC–I's. In illustrating the possible tax benefits of an all-rental program, Royal's representative assumed an average of 8000 copies per month for the first three years at a charge to customers of several cents per copy, producing a rental revenue of $273 per month per machine; a maintenance factor of ½ cent per copy for the first three years, exclusive of supplies; depreciation based on a useful life of seven years; and general and administrative expenses of 15% for the first three years. Royal's representative informed the attending dealers that for exact computations, they should use their own figures.

Appellees contend that these representations warranted both a specific profitability and a definite maintenance level. We hold that the record contains insufficient evidence to show that Royal warranted a specific profitability for the machine. One could construe the evidence as a warranty by Royal that dealers could obtain the profit level contained in the "Curacao assumptions"; but such a warranty would depend upon many variables—at least on the dealers' conforming to the pricing scheme envisioned by the presentation. The record is devoid of any evidence that XSC rented RBC–I's on this basis.

The evidence supports submission of the issues of whether Royal breached warranties regarding the useful life of the RBC–I and the maintenance costs. *See Royal Business Machines, Inc. v. Lorraine Corp.*, 633 F.2d at 44. In their counterclaim, appellees alleged that Royal had expressly warranted that "the maintenance factor" for each RBC–I was ½ cent per copy produced. Such an express warranty regarding maintenance costs would be tantamount to a guarantee by Royal that no matter what XSC's wage costs and other expenses

---

4. We note, however, that with each purchase, appellees acquired expanded knowledge of the capacities of the RBC–I's. This expanded knowledge should be considered in deciding whether the representations formed the basis of the bargain. "The same representations that could have constituted an express warranty early in the series of transactions might not have qualified as an express warranty in a later transaction if the buyer had acquired independent knowledge as to the fact asserted." *Royal Business Machines, Inc. v. Lorraine Corp.*, 633 F.2d at 44.

might reach during the life of the machine, XSC would spend ½ cent per copy for maintenance. To state the nature of such a statement illustrates the difficulty of its proof. Nevertheless, a guarantee is actionable under Fla.Stat.Ann. § 672.313. *See Dailey v. Holiday Distributing Corp.,* 260 Iowa 859, 151 N.W.2d 477 (1967). As unrealistic as such a guarantee may appear, Royal may have made such an express warranty regarding maintenance costs.

■■■■ Appellees claim that the representation regarding maintenance costs constitutes both an express warranty and an actionable misrepresentation. *See* Section V. *supra.* An allegation of breach of express warranty does not require proof of intent. *See Carter Hawley Hale Stores, Inc. v. Conley,* 372 So.2d 965, 968 (Fla.App. 1979). To prove that this representation is an actionable misrepresentation, appellees must show that at the time the representation was made, Royal either lacked the intent to perform or specifically intended not to perform. *Bernard Marko & Associates, Inc. v. Steele,* 230 So.2d 42 (Fla.App.1970). Appellees would not prove actionable misrepresentation merely by showing higher maintenance costs resulting from inflation or higher wages and other unanticipated maintenance expenses. Such a showing would, however, prove breach of an express warranty, if Royal made such a guarantee regarding maintenance costs.

■■■■ The "Curacao Assumptions" do not constitute such a warranty. Those representations show, as a matter of law, only how assumptions regarding certain maintenance costs, exclusive of supplies, could be used to compute certain tax advantages of renting RBC–I's. The Curacao presentation warrants only that Royal could perform its mathematics properly. Whether other statements by Royal representatives constitute an express warranty regarding maintenance costs is a matter for the factfinder to determine at the new trial.

■■■■ Royal contends that appellees' failure to give timely notice of any breach and their improper maintenance and unau-

thorized modifications of the RBC–I's preclude any breach of warranty claims. As a condition precedent to recovery for breach of warranty, a buyer must notify the seller of the breach "within a reasonable time after he discovers or should have discovered any breach . . . ." Fla.Stat.Ann. § 672.607. The buyer bears the burden of showing that he gave the required notice within a reasonable time. *General Matters, Inc. v. Paramount Canning Co.,* 382 So.2d 1262, 1264 (Fla.App.1980). The notice must be both timely· and sufficient under the circumstances and is governed by the buyer's obligation to act in good faith. Fla.Stat.Ann. §§ 671.203, 672.103; *see Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957, 970–71, 976–79 (5th Cir.1976) (applying Florida law). Where the buyer gives some notice of the breach, the issues of timeliness and sufficiency are questions of fact. *See T.J. Stevenson & Co. v. 81,193 Bags of Flour,* 629 F.2d 338, 359 (5th Cir.1980).

■■■ Royal asserts that appellees breached these obligations by not giving "unequivocal notice" and by continuing to order repair and replacement parts from Royal and to pay without protest. *See K & M Joint Venture v. Smith International, Inc.,* 669 F.2d 1106, 1112–16 (6th Cir.1982). Appellees, however, presented sufficient evidence from which a jury could infer that the notice was both sufficient and timely. Appellees brought various maintenance, parts, shortages and defective supply problems to the attention of Royal representatives. In response to one letter noting these problems, several Royal representatives went to XSC's offices in January 1976 to resolve problems. Additionally, appellees presented evidence that Royal repeatedly assured appellees that it would resolve the problems. These complaints related to the alleged express warranties regarding useful life and maintenance costs and were "sufficient to let the seller know that the transaction [was] still troublesome and [needed to] be watched." Fla.Stat.Ann. § 672.607, Official Comment 4.

■■■■ Royal also maintains that XSC's improper maintenance and unauthorized

modifications preclude any breach of warranty claim. Appellant contends that "uncontroverted evidence" established that XSC never properly maintained its RBC–I's and made numerous unauthorized modifications to them. Appellant's Brief at 25. A breach occurs only if the goods are defective upon delivery, not if the buyer's abuse and neglect results in the goods becoming defective. *Royal Business Machines, Inc. v. Lorraine Corp.*, 633 F.2d at 44. Appellees assert that they submitted evidence showing that Royal authorized the modifications to the RBC–I's by assisting dealers, including XSC, in obtaining non-Royal quiet down and speed up kits and publishing a letter in November 1973 informing dealers where and how to purchase the kits and instructing dealers that the speed up and quiet down kits had to be installed simultaneously. Royal also demonstrated these kits at trade shows, showed dealers how to install quiet down kits, and allegedly itself used the quiet down kit on its RBC–I's for demonstration at trade shows.[5] Whether these modifications were unauthorized in view of Royal's notice that such modifications would remove warranty protection and whether improper maintenance precluded any breach of warranty claim are matters for the jury to determine. *Posey v. Pensacola Tractor & Equipment Co.*, 138 So.2d 777, 780 (Fla.App.1962).

### V. *Fraud and Misrepresentation*

■ Under Florida law, the essential elements of a fraudulent misrepresentation include: (1) a false statement concerning a specific material fact; (2) a showing that the representer knew, or should have known, that the representation was false;

(3) an intention that the representation induce another to act on it; and (4) consequent injury to the party acting in justifiable reliance on the representation. *Bissett v. Ply-Gem Industries, Inc.*, 533 F.2d 142, 146 (5th Cir.1976); *Sutton v. Gulf Life Insurance Co.*, 138 Fla. 692, 189 So. 828 (1939); *Amazon v. Davidson*, 390 So.2d 383, 385 (Fla.App.1980). The plaintiff bears the burden of proof by the greater weight of the evidence. *Sprayberry v. Sheffield Auto & Truck Service, Inc.*, 422 So.2d 1073, 1074–75 (Fla.App.1982).

■ The trial judge instructed the jury concerning the five following alleged misrepresentations:

(1) the RBC–I would not be sold or offered to potential consumers for less than the retail price;

(2) the RBC–I had been fully tested, was free from defect in design and operation, and was particularly desirable as a product for leasing to the customers of defendants;

(3) financial projections, based upon testing and experience, revealed that the leasing and rental of the RBC–I would result in a profitable enterprise;

(4) Royal would not unfairly compete with the defendants in the retail market;

(5) Royal would accord to defendants the same treatment, service, benefits, policy decisions, aid and information given and furnished to branches and other dealers in similar and like circumstances.

Appellees concede that the record contains insufficient evidence to support alleged misrepresentations (1) and (5). Appellees also concede that misrepresentation (3) is a "puffing" statement by a dealer.[6] *See Roy-*

---

**5.** We do not address whether these RBC–I's modified with the quiet down kit constituted a "sample or model which is made part of the basis of the bargain" thereby creating an express warranty "that the whole of the goods shall conform to the sample as modeled." Fla.Stat.Ann. § 672.313(1)(c).

**6.** Appellees note that Royal itself proposed the instruction that the trial judge submitted to the jury. Under this instruction, appellees had to prove any one of the five alleged misrepresentations in order to prove their fraud claim.

Appellees argue that having urged the court to submit all five alleged misrepresentations in the alternative to the jury, Royal is estopped from claiming that the instruction was erroneously submitted. Appellees' Brief at 39; *see Bissett v. Ply-Gem Industries, Inc.*, 533 F.2d at 145. Since we hold that the trial court's errors in instructing the jury on other issues require our remanding this case for a new trial, we need not address this contention and offer our observations about the misrepresentation

*al Business Machines, Inc. v. Lorraine Corp.,* 633 F.2d at 45.

■ We hold that alleged misrepresentation (2), that the RBC–I had been fully tested and was free from design and operational defects is actionable. Royal correctly argues that the statement that the RBC–I was particularly desirable as a product for leasing constituted puffing and was not actionable. *Id.; Stoler v. Metropolitan Life Insurance Co.,* 287 So.2d 694 (Fla.Dist.Ct. App.1974). The record also supports Royal's assertion that no evidence supports any allegation that the RBC–I had not been fully tested.[7] However, a jury could reasonably infer that the RBC–I was not free from defect in design and operation.

■ We cannot ascertain from the existing record whether representation (4), that Royal would not unfairly compete with appellees in the Miami area is actionable. Actionable misrepresentations must ordinarily relate to a past or existing fact. *Sleight v. Sun and Surf Realty, Inc.,* 410 So.2d 998 (Fla.App.1982). A false statement amounting to a promise to do something in the future is not actionable fraud, *Stoler v. Metropolitan Life Insurance Co.,* 287 So.2d 694 (Fla.App.1974); *Evans v. Gray,* 215 So.2d 40 (Fla.App.1968), *cert. denied,* 222 So.2d 748 (Fla.1969), even though the representation was made to induce another to enter into a transaction. *Hinzelin v. Bailly,* 155 Fla. 837, 22 So.2d 43 (1945). A plaintiff seeking to recover for such a misrepresentation must show that the promisor either lacked the intention to perform the promise or specifically intended not to perform at the time the representation was made. *Bernard Marko & Associates, Inc. v. Steele,* 230 So.2d 42 (Fla.App. 1970).

■ Appellees did not adduce sufficient evidence at the trial to show that this alleged misrepresentation was actionable. Ted Mark testified that Royal represented

that it would not compete with XSC in Miami. Appellees also introduced evidence that Royal addressed letters to XSC's rental customers inviting them to do business with Royal on a "straight purchase" basis and advising that they would profit more by doing business directly with Royal than with an independent dealer. Royal suggested to one XSC customer, Southeast First National Bank of Miami, that its two RBC–I's might not be performing satisfactorily because they were provided by a local dealer rather than by Royal. The bank then cancelled·its leases with XSC. A jury could reasonably infer that these cancellations were a result of Royal's direct competition with XSC. Appellees did not however ever show that Royal intended not to honor its alleged promise at the time the representation was allegedly made. Without evidence showing this lack of intent, appellees cannot recover in tort for this alleged misrepresentation.

■ Royal asserts that appellees waived any claim for fraud by acquiring knowledge of the truth of any alleged misrepresentations over the 30-month period during which XSC purchased RBC–I's from Royal. Appellees did not waive their claim for fraud as a matter of law by continuing to do business with Royal. *See Bissett v. Ply-Gem Industries, Inc.,* 533 F.2d 142, 151 (5th Cir.1976). We conclude that the trial judge properly submitted the issue of whether appellees had waived the fraud to the jury.

### VI. *Tortious Interference with Business Relationships*

■ XSC asserted at trial that Royal's competition in the Miami area tortiously interfered with XSC's business relationships. Under Florida law, the elements of tortious interference include: (1) the existence of an advantageous business relationship under which the plaintiff has legal rights; (2) an intentional and unjustified

claims to assist the district court at the new trial.

**7.** Appellees' reliance on the August 1971 test report on the UBIX–600 is inappropriate in

view of the uncontroverted evidence that Royal modified the machines *before* testing them for Underwriters' Laboratories and placing them in the market.

interference with that relationship; and (3) damage to the plaintiff. *R.C. Hilton Associates, Inc. v. Stan Musial and Biggie's, Inc.,* 702 F.2d 907, 908–09 (11th Cir.1983); *Ahern v. Boeing Co.,* 701 F.2d 142, 143–44 (11th Cir.1983); *Unistar Corp. v. Child,* 415 So.2d 733, 734 (Fla.App.1982); *Wakenhut Corp. v. Maimone,* 389 So.2d 656 (Fla.App.1980); *Smith v. Ocean State Bank,* 335 So.2d 641, 644 (Fla.App.1976). Florida law recognizes the right of competitors to compete for customers. *Wakenhut Corp. v. Maimone,* 389 So.2d at 658.

■ XSC bases its intentional interference claim on Royal's efforts to solicit business in the Miami area. XSC urges that the jury could have reasonably found that its loss of Southeast Bank as a customer resulted from tortious interference. We disagree. Royal's solicitations in the Miami area did not constitute an unjustified interference with XSC's business relationships. Competition for business does not constitute tortious interference with a business relationship. *See id.* XSC has not presented any evidence that this competition was unjustified. XSC's claim that this action "violated ... Royal's promise to Ted Mark that it would not compete with XSC," Appellees' Brief at 44, establishes a cause of action for breach of the alleged contract or, perhaps, for fraud, not for tortious interference.

## VII. *Damages*

■ At trial, appellees sought to recover profits which they lost by operating their business with defective copiers. In order to recover lost profits, appellees must prove damages with reasonable certainty. *Beverage Canners, Inc. v. Cott Corp.,* 372 So.2d 954, 956 (Fla.App.1979). Appellees must prove with reasonable certainty that their damages "flowed as the natural and proximate result" of Royal's alleged wrongful conduct. *Aldon Industries, Inc. v. Don Myers & Associates, Inc.,* 517 F.2d 188, 191 (5th Cir.1975). They need not show the precise amount of damages so long as the trier of fact can arrive at an intelligent estimate without speculation or conjecture. *See id.* Appellees may recover anticipated

profits only by making reasonably certain by competent proof the amount of their actual loss. *Tech Corp. v. Permutit Co.,* 321 So.2d 562 (Fla.App.1975).

■ Appellees failed to establish lost profits with the requisite certainty at trial. Appellees proof of damages consisted of a "Special Analysis" which purported to show XSC's "actual losses and lost profits" for a 10-year period. The analysis compared what XSC actually earned with an estimate of what XSC would have earned had it leased all of its RBC–I's and otherwise operated its business on the basis of the assumptions used in the presentation at Curacao. Such an analysis does not satisfy appellees' burden. The record does not contain any evidence that appellees ever operated their business in accordance with the "Curacao Assumptions." These assumptions, used to illustrate potential tax advantages of renting RBC–I's, incorporated rental and copy rates which XSC elected not to use. XSC also sold forty percent of its RBC–I's, whereas the "Curacao Assumptions" assumed a one hundred percent rental program.

A proper analysis of appellees' lost profits must account for the variable of technological innovation. When first introduced in 1971, the RBC–I contained technological innovations which placed the machine at the forefront of the art. The Curacao illustration did not consider the subsequent technological improvements which undoubtedly affected the profitability of the RBC–I just as the completion of the transcontinental telegraph lines and railroads impacted on the profitability of the Pony Express. A satisfactory analysis of lost profits cannot use figures which result in too many variables, specifically the effect of other advances in the art on the RBC–I's profitability. *See Beverage Canners, Inc. v. Cott Corp.,* 372 So.2d 954 (Fla.App.1979). The analysis used did not account for changes in the state of the art which would have affected profitability. Allowing for differences between the theoretical firm used in the Curacao illustration and XSC, we conclude that the hypothetical firm in this

study was not sufficiently comparable to plaintiff's business operation. *See Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 667 (5th Cir.1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975).

■ Royal argues that the trial court erred in allowing plaintiffs to recover punitive damages. Although we hold that plaintiffs may properly seek recovery for punitive damages, we note several parameters which govern this case. First, Florida law does not allow punitive damage awards for breach of warranty claims under the Uniform Commercial Code. *Bill Branch Chevrolet, Inc. v. Redmond,* 378 So.2d 319, 321 (Fla.App.1980). Plaintiffs may recover punitive damages only when the acts of the contractual breach also amount to a separate and independent tort which was willfully and wantonly committed or attended by abuse, malice, or gross negligence. *See Splitt v. Deltona Corp.,* 662 F.2d 1142, 1146–48 (5th Cir. Unit B 1981); *Nicholas v. Miami Burglar Alarm Co.,* 339 So.2d 175, 177–78 (Fla.1976); *Griffith v. Shamrock Village, Inc.,* 94 So.2d 854, 858 (Fla.1957). Plaintiffs must also establish that the willful tort caused damages separate and distinct from damages attributable to warranty claims. *Rolls v. Bliss & Nyitray, Inc.,* 408 So.2d 229, 237 (Fla.App.1981); *Overseas Equipment Co. v. Aceros Arquitectonicos,* 374 So.2d 537, 538–39 (Fla.App.1979).

■ Appellees have stated a cause of action on their tort claim of fraud.[8] Appellees' claims for damages on the allegations that Royal misrepresented features of the RBC–I are not distinct from appellees' breach of warranty claims and can not support an award of punitive damages. *Rolls v. Bliss & Nyitray, Inc.,* 408 So.2d at 237. On retrial, appellees may, however, recover punitive damages for a separate tort claim, provided that appellees proves at least nominal damages attributable distinctly to this tort. *See Overseas Equipment Co. v. Aceros Arquitectonicos,* 374 So.2d at 538–39.

### VIII. *Revocation of Acceptance*

■ Royal argues that the district court erred in permitting the jury to consider whether XSC timely revoked acceptance of its 193 RBC–I's including the 71 RBC–I's that XSC had sold before announcing its purported revocation. A buyer may revoke his acceptance of goods "whose non-conformity substantially impairs its value to him" if the buyer proves that he accepted the goods

(a) On the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) Without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

Fla.Stat.Ann. § 672.608(1). The revocation "must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects." Fla.Stat.Ann. § 672.608(2). The non-conformity of the goods must be present at the time of sale and delivery. *See Holcomb v. Cessna Aircraft Co.,* 439 F.2d 1150, 1155–56 (5th Cir.), *cert. denied,* 404 U.S. 827, 92 S.Ct. 62, 30 L.Ed.2d 56 (1971).

■ We hold as a matter of law that XSC's purported revocation was not effective since it was made after substantial changes in the condition of the goods. "[T]he buyer may not revoke his acceptance if the goods have materially deteriorated except by reason of their own defects." Fla.Stat.Ann. § 672.608, Official Comment 6. XSC attempted to tender back the RBC–I's in November 1976, having received its last RBC–I in June 1975. The evidence is uncontradicted that XSC returned 122 of the RBC–I's in used, improperly maintained condition. XSC's own records established that the machines had not been properly maintained; and XSC had modified 106 of

---

8. As noted earlier, appellees may not recover on the basis of the representations to Mark on a theory of intentional interference with business relations. Consequently, on remand the trial court should not allow recovery of punitive damages on this theory.

the machines it returned. Appellees assert that the jury could have found that these machines were returned without substantial changes in their condition which were not caused by their own defects. Appellees' Brief at 54. Appellees did not show that the changed conditions of the RBC–I's resulted exclusively from their own alleged defects. *See id.* The trial court erred in holding that the revocation was timely.

## IX. *Royal's Claim*

Royal argues that it was entitled to judgment in its favor on the promissory notes as a matter of law. The trial judge instructed the jury that all the notes were due subject to XSC's defenses of fraud in the inducement and failure of consideration. Sufficient evidence supported the trial judge's instructions on the defense of fraud.

■■■■ The trial judge erred in his instruction to the jury regarding failure of consideration as a defense to Royal's claim. The record contains sufficient evidence from which the jury could conclude that Royal was not a holder in due course. *See* Fla.Stat.Ann. § 673.302(1). Royal was therefore subject to the defense of want or failure of consideration.[9] Fla.Stat.Ann. § 673.408 provides that

> [w]ant of failure of consideration is a defense as against any person not having the rights of a holder in due course .... Partial failure of consideration is a defense pro tanto whether or not the failure is in an ascertained or liquidated amount.

The parties dispute whether the statute creates a defense of failure of consideration even if XSC derived some beneficial use from the RBC–I's. A close reading of the statute indicates that a total failure of consideration is necessary for a complete defense against Royal's claim on the promissory notes. A partial failure of consideration discharges only as much of the claim as corresponds to the failure itself. *See Hart*

---

**9.** Under Florida law, want of consideration means a total lack of any valid consideration for a contract. Failure of consideration is the neglect, refusal, or failure of one of the parties

*Industrial Supply Co. v. Craig,* 405 P.2d 93, 96 (Okl.1965).

The trial judge instructed the jury that:

> a failure of consideration can occur ... when the value of goods, as measured by the essential purpose to be served by the buyer's purchase of the goods in the first place, is substantially impaired to the buyer by reason of defects in the goods.

Transcript at 5880. The evidence is uncontroverted that XSC received in excess of $714,000 in revenues from renting and selling RBC–I's. XSC, therefore, could not plead total failure of consideration. The trial judge's instruction was clearly erroneous. We, therefore, remand the determination of liability on Royal's claim for a new trial.

## X. *Conclusion*

We hold that the district court erroneously submitted to the jury the issues of implied warranty of fitness for a particular purpose, implied warranty of merchantability, intentional interference with a business relationship, and revocation of acceptance. We also hold that the district judge improperly instructed the jury on the issues of fraud, express warranties, and failure of consideration as a defense to Royal's claim. We therefore REVERSE the judgment of the district court and REMAND for a new trial.

REVERSED and REMANDED.

---

to perform or furnish the agreed on consideration. *Holm v. Woodworth,* 271 So.2d 167 (Fla. App.1972).