In re Joseph DiMARTINO, Debtor.

850 AQUIDNECK AVENUE ASSOCI-
ATES, a General Partnership, Ralph
Papitto and Richard Bready General
Partners of 850 Aquidneck Avenue As-
sociates, Plaintiffs,

v.

AQUIDNECK COURT ASSOCIATES, a
Limited Partnership, Joseph A. DiMar-
tino and Donald T. Marini General
Partners of Aquidneck Court Associ-
ates, Defendants.

Bankruptcy No. 8500345.
Adv. No. 870017.

United States Bankruptcy Court,
D. Rhode Island.

Feb. 15, 1989.

As Amended March 24, 1989.

Milton Stanzler, Peter J. Cerilli, Cerilli,
McGurl, Hustwit & Bicki, Providence, R.I.,
for plaintiffs.

Andrew Richardson, Boyajian, Harring-
ton & Richardson, Robert Corrente, Cor-
rente & Brill, Providence, R.I., for defen-
dants.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr.,
Bankruptcy Judge.

Heard on April 6, 7, 8, 11, and 16, 1988,
on the Amended Complaint of the plaintiff,
850 Aquidneck Avenue Associates, a gener-
al partnership, against the defendants,
Aquidneck Court Associates, a limited part-
nership, and its two general partners, Jo-
seph A. DiMartino, the debtor, and Donald
T. Marini. The plaintiffs' complaint, which
seeks, inter alia, compensatory and punitive
damages, is based on alleged fraudulent
conduct of the defendants in connection
with the November 15, 1984, purchase of
the building and property located at 850
Aquidneck Avenue, Middletown, Rhode Is-

land. Arguments were heard on April 26, 1988.[1]

### THE FACTS [2]

On October 15, 1981, the defendants Joseph DiMartino and Donald Marini formed a limited partnership called "Aquidneck Court Associates" ("ACA"), which originally consisted of two general partners, Marini and DiMartino, and two limited partners, Richard Lupo (Class A) and William H. Smith, Jr. (Class B).[3] During the latter part of 1982, ACA developed and built the subject property, an office building located at 850 Aquidneck Avenue, Middletown, Rhode Island. The general contractor for this project was the DiMartino Company, a construction and real estate development company, of which Joseph DiMartino is the president and chief executive officer. In the summer of 1984, Marini and DiMartino decided to sell the property, and obtained an appraisal by Peter A. Laudati on June 5, 1984.[4] At the time of the appraisal, approximately sixty percent, or 19 of the office suites were rented. The remaining seven unoccupied units were under a rental option by the General Dynamics Corporation, Electric Boat Division, which option would expire December 1, 1984, if not exercised by that date. (Joint Exhibit No. 74.) In search of a buyer, DiMartino contacted Richard Bready and Ralph Papitto. Since the early 1980's, DiMartino had been involved in a number of ventures with Bready and Papitto, where partnerships were formed for specific real estate development projects, including: East Greenwich Land Association, Gaspee Park, and the Beach Street Association. When presenting the 850 Aquidneck Avenue proposal to Bready and Papitto, and until two days before the closing, DiMartino failed to disclose to Papitto and/or Bready that he was a general partner of the selling partnership, or that his construction company, the DiMartino Company, was still owed $200,000 as the general contractor on the project.

During this time, the DiMartino Company had in its employ Michael A. Voccola, Vice President of Development. In June 1984, at Papitto's suggestion,[5] DiMartino hired Voccola as project manager for all Papitto–DiMartino partnerships, including the 850 Aquidneck Avenue project which they were then negotiating. To enhance the marketing of 850 Aquidneck Avenue, Mr. voccola prepared a pro forma statement, which he described as a proposed financing package that includes a projection of income and expenses. The information that went into the pro forma was supplied by Joseph DiMartino.[6] On October 22, 1984, Voccola, on DiMartino Company letterhead, forwarded the pro forma to Papitto and Bready. The cover letter indicated that although "there are some ambigutious (sic) circumstances, notably the Option Agreement held by General Dynamics ... we feel the prospects of their taking the option are good, which lends all the more credence to this deal." (Joint Exhibit No. 11.)

After taking into consideration the pro forma projections and the likelihood of Electric Boat exercising its option, Bready and Papitto, unaware of DiMartino's dual status, decided to join with him to form a partnership and purchase the property. Both Bready and Papitto testified that Di-

---

1. The parties, at our request, also submitted proposed findings of fact and conclusions of law at the time of the oral arguments.

2. This opinion constitutes our findings of fact and conclusions of law. *See* Bankruptcy Rule 7052 and Fed.R.Civ.P. 52.

3. On December 30, 1981, the partnership was amended to include two additional limited partners, both Class A, Robert Blanchette and T. Quinlan Regan, Jr.

4. The Laudati appraisal utilized the income approach to arrive at a market value of $2,150,000.

The appraisal contemplated a completed building which included for each suite: finished walls, suspended ceilings, carpeting, bathrooms, separate HVAC systems, and individual electrical systems.

5. Although there is a dispute as to who Voccola was initially working for, we find that when Voccola prepared the pro forma, he was acting with complete authority for DiMartino.

6. The Papitto family has been friendly with the Voccolas for years, and Ralph Papitto has known Michael Voccola since he was ten years old.

Martino never told them that the building needed to be finished, or that, contrary to the pro forma representation, it was not in a completed state. DiMartino, on the other hand, claims that he told Papitto and Bready that the property needed so-called, "tenant improvements," but that they did not consider it a big issue. Strangely, during the first six months that Voccola was employed as the project manager of 850 Aquidneck Avenue,[7] he not once made a site visit, and he never saw the subject property prior to the closing. Additionally, neither Bready nor Papitto ever made an official visit to the property prior to purchasing it, although Papitto did drive by and view the outside of the building one rainy Sunday, while giving his son a driving lesson. Bready and Pappito both testified that they did not personally inspect the property because they were relying on DiMartino to look out for their interests as the purchasers of the property.

At a meeting held two days before the date set for closing, Bready and Papitto first learned of DiMartino's affiliation with both the buyer and seller of the same property. They also first became aware at that same time, that Attorney Jerome Batty was representing both the seller and the buyer at the closing. Out of understandable concern over these revelations, and since the parties had not yet executed a purchase and sale agreement, Bready and Papitto insisted, as a condition precedent to closing, that ACA sign a "representations and warranties" letter, certifying to the condition of the building and real estate. Such a warranty letter, dated November 15, 1984, was prepared and signed by both DiMartino and Marini, and presented to the buyer at the closing. (Joint Exhibit No. 16.) On the same day, Bready and Papitto formed the general partnership known as 850 Aquidneck Avenue Associates ("AAA"), for the sole purpose of purchasing and operating the subject property. In addition to Papitto and Bready, who each held a 40 percent interest, there were three other general partners: Joseph DiMartino, Albert V. DiMartino (Joseph's father), and Richard Lupo, each holding a 6.67% interest. At the time of the formation of the AAA general partnership, DiMartino was acting as its managing general partner, and he represented the partnership at the closing with ACA. Neither Bready nor Papitto attended the closing, although Voccola was there on behalf of AAA. Marini was present for ACA, and Attorney Batty was there representing both sides, as was Joe DiMartino.[8] Although the asking price for the building and real estate was originally $2,100,000, a $1,900,000 purchase price was eventually settled on. As part of the financing arrangement, AAA gave a promissory note to ACA in the amount of $184,662. DiMartino, as managing partner of AAA, was clearly wearing at least two hats when he signed the promissory note in behalf of the buyer, while at the same time being a principal in both the selling entity and the construction contractor which was still owed $200,000.[9] This is not automatically fatal to the transaction, but becomes much more onerous in light of DiMartino's failure to disclose important facts to his (buying) partners.

A couple of weeks after the closing, Voccola did finally visit the site and was "aghast" when he discovered that seven of the twenty-six units were unfinished,[10] and not in rentable condition. Voccola stated that he immediately confronted DiMartino regarding the condition of the building, and that DiMartino assured him that he "would take care of it."

Probably due to a case of severe embarrassment, Voccola did not advise Papitto or Bready of the unfinished condition of the

---

**7.** The 850 Aquidneck Avenue Associates partnership was not officially formed until the date the property was purchased, November 15, 1984.

**8.** No extraordinary perception is required to predict that this was clearly a potential litigation-producing scenario.

**9.** DiMartino signed the promissory note with the knowledge and consent of all of AAA's partners.

**10.** The seven unfinished units were those earmarked for Electric Boat, which did not exercise its option on December 1, 1984, but instead, leased space with another one of Marini's properties, Newport Corporate Park.

building for six months, until the spring of 1985. When they were finally informed, and also due to concern about continuing vacancies, a meeting was called by Bready and Papitto, during which DiMartino explained that the unfinished work was "tenant improvements." Voccola, finally disagreeing with DiMartino, told Papitto and Bready that what was required to complete the building went way beyond tenant improvements.[11] At this point, DiMartino, in an attempt to distract everybody's attention from himself, recommended that they contact Marini (not present) regarding the problems being discussed. Immediately after the meeting, Bready removed DiMartino as managing general partner of AAA and appointed himself to that position.

On March 31, 1985, as a result of increasing tension between them, Voccola resigned from DiMartino's employ and formed the Cassidy Group, which was then hired by Papitto and Bready to take over the management of their four remaining projects, including AAA. During the summer of 1985, the Cassidy Group, as the leasing agent, attempted to market the unoccupied AAA units by advertising, contacting Electric Boat, and by "talking to tenants." He was unsuccessful. The seven unfinished suites remained in that condition, and vacant, because Bready was "unwilling to invest any more money into this project."[12] At some point, Papitto and Bready ordered the Cassidy Group to contact Marini regarding the problem. Between September 1985 and January 1986, Voccola wrote a series of letters to Marini, calling his attention to the unfinished condition of the building, and requesting that ACA either complete the premises, or deduct the cost of completion from the balance of the second mortgage. (Joint Ex-

hibits Nos. 29, 30, 36, 41.) In response, Marini stated that he had "never before been asked to adjust a sale price after the closing," and that "[a] partner in the buying entity [DiMartino], as the agent of the buyer, agreed to the terms and conditions of sale and was fully aware of the condition of the building at the time of closing." (Joint Exhibit No. 37.) Predictably, Marini's letter created an impasse, and after DiMartino filed his Chapter 11 petition[13] on June 4, 1985, AAA sought the assistance of this Court by filing the instant adversary proceeding.

## THE ARGUMENTS

Plaintiffs first contend that they are not liable on the November 15, 1984, promissory note because the unfinished condition of the property constituted a failure of consideration,[14] and they argue that the defendants' failure to convey a completed building was a material breach of their contractual obligation, which relieves plaintiffs entirely of their duty to pay the note. Defendants admit that certain of the units of the building were unfinished, but contend that the selling price reflected the condition of the structure, and that the plaintiffs are liable on the promissory note in the full amount.

Next, the plaintiffs assert that the November 15, 1984, warranty letter executed by both Marini and DiMartino, and oral representations made by DiMartino, represent fraudulent misrepresentations which are the basis for their claims for compensatory and punitive damages. Plaintiffs also seek compensatory and punitive damages based on an alleged conspiracy between DiMartino and Marini, wherein they contend that defendants devised an "illegal

---

11. Peter Scotti, who appraised the property on behalf of plaintiffs testified that the seven vacant suites were not "tenant ready" because of: (1) no air conditioning; (2) no ceilings; (3) walls incomplete; (4) no finished bathrooms; (5) no emergency electrical system; and (6) no demising walls around bathroom. In addition, Mr. Samuel Emerson, a licensed project architect, testified that the building did not comply with the R.I. State Building Code because required fire walls were missing.

12. Bready testified that he contributed $280,000 during AAA's ownership of the property, and that Papitto put in $100,000. This evidence is without supporting documentation.

13. DiMartino originally filed a Chapter 11 petition, however, this was converted to a Chapter 7 case on July 21, 1987.

14. This note, still unpaid, matured on November 15, 1986.

plan" to induce the plaintiffs to purchase the property. Finally, based on DiMartino's alleged fraud and breach of fiduciary obligations, plaintiffs' seek to rescind the AAA partnership agreement, to the extent that it applies to and acknowledges Joseph DiMartino as a general partner, and to have DiMartino removed from said partnership.

A major difficulty for the Court throughout this proceeding, in determining whether defendants made misrepresentations, breached warranties, or caused a failure of consideration, is in ascertaining and reconciling Joe DiMartino's roles as: (1) a partner in the buying entity, AAA; (2) a partner of the seller, ACA; and (3) a principal of the construction contractor which is a $200,000 creditor. We will deal with this issue, as it continuously arises, throughout this opinion.

## FAILURE OF CONSIDERATION

■ R.I.GEN.LAWS § 6A–3–408 (1956, reenactment 1985), entitled "Consideration," states in relevant part that "[w]ant or failure of consideration is a defense as against any person not having the rights of a holder in due course (§ 6A–3–305).... Partial failure of consideration is a defense pro tanto whether or not the failure is in an ascertained or liquidated amount." Construing identical language in a Florida Statute, the Eleventh Circuit Court of Appeals held that "a total failure of consideration is necessary for a complete defense against Royal's (plaintiff's) claim on the promissory notes. A partial failure of consideration discharges only as much of the claim as corresponds to the failure itself." *Royal Typewriter Co. v. Xerographic Supplies,* 719 F.2d 1092, 1107 (11th Cir.1983). In addition, *Royal* characterized a failure of consideration as "the neglect, refusal or failure of one of the parties to perform or furnish the agreed on consideration." *Id.* at 1107, n. 9. (Citation omitted.)

Although the plaintiffs seek to avoid payment of the entire note, it is clear that, at most, a partial failure of consideration oc-curred here, since the building conveyed was substantially complete, with seven of twenty-six units allegedly unfinished. In the event of a partial failure of consideration, the plaintiffs are entitled to offset as much of the note as relates to the cost of finishing the units. *Royal, supra,* at 1107. A more fundamental issue, however, is whether the purchase price was intended to reflect a completed structure, or merely one in its "as is" condition. Bready and Papitto testified that they relied upon the pro forma statement which contemplated and described a finished building, in deciding to purchase the property.[15] Defendant Marini argues that DiMartino, "one of the buying partners, knew the condition of the building at the time of the purchase," that said knowledge should be imputed to the AAA partnership, and that therefore the decision to purchase for $1.9 million was based on that assumption. R.I.GEN. LAWS § 7–12–23 (1956, reenactment 1985), entitled "Partnership charged with knowledge or of notice to partner," provides that

[n]otice to any partner of any matter relating to partnership affairs, and the knowledge of the partners acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.

The plaintiffs argue that DiMartino acted fraudulently in concealing his connection with the seller, and that Marini and DiMartino conspired and devised a plan to induce the plaintiffs to purchase the property, which they knew was unfinished. Although we find no direct evidence of this alleged conspiracy, neither can we impute DiMartino's knowledge of the unfinished condition of the building to the AAA partnership, in light of his clandestine behavior. Nor can we agree that DiMartino's knowledge of the condition of the building consti-

---

**15.** The pro forma statement (Joint Exhibit No. 11) made allowance for operating expenses and debt service, but did not provide for the cost to complete the building.

tuted any part of the basis of the bargain between ACA and AAA. The plaintiffs relied, reasonably in our view, on the pro forma statement when they decided to purchase the property. This document described the physical and financial picture of the property and was created, we believe, for the very purpose of forming the basis of the agreement entered into between the parties. Therefore, because they were not complete as represented in the pro forma, the seven units in question do constitute a partial failure of consideration by the defendants.

## BREACH OF WARRANTY AND FRAUDULENT MISREPRESENTATIONS

■ The plaintiffs also contend that the representations and warranties regarding the condition of the building were fraudulent, inaccurate and incorrect, and that they relied upon these representations, to their detriment. These allegedly fraudulent representations stem from the language in the November 15, 1984, warranty letter signed by both DiMartino and Marini, as partners of ACA. The warranty letter contains eleven numbered paragraphs, and plaintiffs rely particularly on paragraphs 3 and 6 as the basis for their claims of breach of warranty and fraud. Paragraph 3 provides:

3. The building on the property is fully *independent* in all respects including, without limitation, in respect of its structural integrity, heating, ventilating and air conditioning, plumbing, mechanical and other operating and mechanical systems, electrical, sanitation and water systems which are connected directly to offsite utilities located in public streets or ways. Each such building, all related service equipment and all paved or landscaped areas relating to or used in connection with such building are located wholly within the perimeter lines of the property. (Emphasis added.)

Plaintiffs focus their attention on the word "independent." The thrust of their argument is that the operant word "independent" is synonymous with "complete," and argue this to mean that the building was ready for occupancy. As of November 15, 1984, the condition of the building was that: seven of the twenty-six units did not have air conditioning, finished bathrooms, emergency electric, ceilings, completed walls or flooring. There was also no certificate of occupancy issued by the Middletown building inspector for those units, which, they contend, were not ready for occupancy.

Defendants interpret the term "independent" to mean simply that the subject property is not attached to any other structures, that its components were not dependent on any other buildings, and that the building, as described above, was in fact ready for occupancy, "after tenant improvements." We are unable to accept the plaintiffs' argument that the word "independent," as used in paragraph 3 of the warranty letter, means "complete." [16] Having been shown no reason to do otherwise, we find that the plain meaning of the word "independent" as used in paragraph 3 is self-explanatory and connotes a building and components that are not dependent on any other structure. Accordingly, we cannot accept plaintiffs' semantic argument regarding the meaning of the word "independent." We do, however, see a breach of paragraph 3 of the warranty letter in that it does refer specifically to items that the defendants knew were not included in the premises to be conveyed. A prudent reader of that paragraph could reasonably assume that the building was equipped, at least, with heating, ventilation, air conditioning, and plumbing—this is what the sellers intended to be understood by that language, and this is precisely what the plaintiffs relied on when they purchased the subject property.

---

16. *Webster's New World Dictionary,* 714 (2nd ed. 1979), defines "independent" as "free from the influence, control or determination of another or others ... not connected or related to another...." Clearly the term does not embrace the construction "complete." Common knowledge even dictates that the term "independent" is the opposite of "dependent," which is customarily understood to mean "relying on," *Webster's New World Dictionary,* 378 (2nd ed. 1979), and not to mean "incomplete" as plaintiffs would have us believe under their construction.

Plaintiffs argue that paragraph 6 of the warranty letter was also breached by the defendants. That paragraph provides:

> The building does not violate any applicable Federal or State law or governmental regulation, or any local ordinance, order or regulation or ordinances relating to zoning, building use and occupancy, subdivision control, fire protection, health, sanitation, air pollution, water pollution, wetlands protections and protection of the environment. There are no hazardous waste materials buried or otherwise located on the property. The property complies with zoning laws and regulations as presently in effect. All private ways providing access to the property are zoned in such a manner which will permit access to the property over such ways.

This paragraph represents that the building is in conformity with Federal, State and local regulations relating to fire protection and certificates of occupancy. Samuel Emerson, a well qualified and licensed architect testified on the plaintiffs' behalf that he inspected the building twice—once on September 29, 1987, and again on April 4, 1988, and determined on both occasions that the building did not have required fire walls, and therefore was not in compliance with the R.I. State Building Code. We accept Mr. Emerson's findings and hold that the absence of a fire wall is a material breach of warranty. In addition, John Maloney, the present Building Inspector for the Town of Middletown [17] testified that only a temporary certificate of occupancy was ever issued for this building because "full compliance with all appropriate codes have not been met." (Joint Exhibit No. 4B.) The defendants' failure to obtain the required certificates of occupancy clearly constitutes a breach of paragraph 6 of the November 15, 1984, warranty letter.

Plaintiffs also contend that the defendants' failure to sell them a completed building, their failure to bring the building into compliance with local building codes, and their failure to secure the Electric Boat option, constitute additional elements of fraud.

Although it may seem harsh, in Rhode Island, even an innocent misrepresentation of a material fact, if it induces reliance, may be actionable. *Dudzik v. Leesona Corp.*, 473 A.2d 762, 766 (R.I.1984) (citing *Halpert v. Rosenthal*, 107 R.I. 406, 415, 267 A.2d 730, 735 (1970)). Such a misrepresentation occurs when there is a "manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts." *Dudzik, supra,* at 766 (citing *Halpert, supra,* at 107 R.I. at 413, 267 A.2d at 734). To become material, the misrepresentation must be likely to affect the conduct of a reasonable person in relation to a matter with another person. *Id.* at 766–767.

Here, the subject property was clearly in violation of the local building code and, therefore, paragraph 6 of the warranty letter represents "an assertion not in accordance with the facts." Additionally, the pro forma statement constitutes an assertion that the building was complete and ready for occupancy, which we have found is contrary to the facts. That the plaintiffs did not inspect the building prior to purchasing it does not change this conclusion,[18] for "where one relies upon another's representation of an existing fact and is thereby misled to his damage he may maintain an action for deceit, notwithstanding his failure to make further inquiry which was open to him at the time and which would have disclosed the falsity of such representation." *Campanelli v. Viscera,* 75 R.I. 71, 74, 63 A.2d 722 (1949) (citing *Hunt v. Barker,* 22 R.I. 18, 46 A. 46 (1900)). Even though DiMartino was a partner of the buying entity, we will not impute his knowledge of the unfinished condition of the building to them, where he concealed important facts from his part-

---

17. The building inspector during the time in question was Lawrence A. Augustus, and Joint Exhibit No. 4B is the temporary certificate of occupancy he issued on February 25, 1983.

18. We would have had more difficulty with this point, had Bready and Papitto not been relying on their "partner" to look out for their interest.

ners, including: (1) his dual role, until just before the closing, (2) the unfinished condition of the building, and (3) the fact that his construction company was owed $200,000 on the job. *See* R.I.GEN.LAWS 7–12–23 (1956, reenactment 1985) (partnership not charged with knowledge of another partner where fraud is committed).

We also agree that the defendants, in a further attempt to induce AAA to purchase the property, knowingly misrepresented the likelihood of Electric Boat exercising its rental option.

During the initial negotiations between ACA and AAA in June, 1984, the parties contemplated an Electric Boat ("EB") rental option, and on August 1, 1984, EB did enter into such an option agreement with ACA, which covered seven unoccupied suites. Under the agreement the option would expire, unless exercised, on September 30, 1984. (*See* Joint Exhibit No. 65). Just prior to the expiration of the option period, Marini sent EB a new agreement, which extended the time for exercising the option to December 1, 1984. (*See* Joint Exhibit No. 74). Bready testified that he was never informed of the December extension, and, since he was never advised that EB did not exercise the September option, he firmly believed at the closing that it had. Correspondence between EB and Marini clearly shows that, at least by October 1984, EB had definitely decided not to exercise its option, but instead intended to lease other space owned by Marini, located at One Corporate Place! (*See* Joint Exhibit Nos. 70, 71). In addition, Steve George, who is the Chief of Engineering Facilities at Electric Boat and who was responsible for locating space for the company, testified that by October 1984, EB had decided to lease space in One Corporate Place, rather than in 850 Aquidneck Avenue, and that Marini was "touting" his Corporate Place in September 1984, rather than the space at Aquidneck Avenue. Although Marini claims that everyone knew at the closing that EB was not going to exercise its option with 850 Aquidneck Avenue, this is disputed by Bready, Papitto and Voccola. Interestingly, Marini himself confessed that he had no specific recollection of informing DiMartino, his own partner, of EB's decision not to exercise its option, and, also felt it wasn't "his place" to tell Voccola. Mr. George has no stake in the outcome of this litigation, and I believe him.

As we noted earlier, *see* infra page 140, the defendants, in the written pro forma package, specifically represented that they believed Electric Boat would accept the rental option.[19] Both Bready and Papitto asserted that, based on the positive remarks in the pro forma and their discussions with DiMartino, who repeatedly told them the Electric Boat option was likely, they decided that the purchase was a good business decision.

Considering all of these factors, it is clear that Marini intended to induce the plaintiffs to rely upon Electric Boat exercising its option, which made the purchase much more attractive. We also find that Marini intentionally misrepresented the likelihood of this occurring, an inescapable finding, in light of his concealment of EB's October decision to lease One Corporate Place from Marini.

## BREACH OF FIDUCIARY DUTY

The plaintiffs also contend that DiMartino's conduct as discussed above, constitutes a breach of fiduciary duty, which entitles them to remove him from the AAA partnership. Although the partnership agreement itself does not describe the duties of partners,[20] (*See* Joint Exhibit No. 16.) R.I. GEN.LAWS 7–12–31 (1956, reenactment 1985) entitled "Duty of partners to

**19.** By that time, according to Electric Boat, it had already decided to lease One Corporate Place from Donald Marini.

**20.** The only provision in the AAA partnership agreement which addresses the duties of partners is contained in paragraph 10. Paragraph 10, entitled "Managing Partner," names Joseph DiMartino as the initial managing partner and grants him indemnity from the partnership for his acts *unless* his conduct constitutes "negligence, misconduct or a breach of his fiduciary obligations to the partnership...." (Joint Exhibit No. 16, ¶ 10.) (Emphasis added.)

render information" provides that "[p]artners shall render on demand true and full information of all things affecting the partnership to any partner or the legal representative of any deceased partner or partner under legal disability." Even though the negotiations for the purchase of the subject property took place before the formal execution of the partnership agreement,[21] the ongoing relationship and business dealings between these parties require us to conclude that a de facto partnership existed and related back to the inception of the AAA negotiations,[22] despite the fact that the relationship was not memorialized until the day of closing. Clearly, when presenting his proposal to Bready and Papitto, DiMartino was under a duty to disclose *all* material facts within his knowledge in relation to the deal, especially his conflicting roles, the unfinished condition of the building, and the $200,000 debt to the DiMartino Company, of which he was president.

DiMartino's concealment of such important facts from his (buying) partners subjects him to removal from the AAA partnership, pursuant to R.I.GEN.LAWS 7–12–43(1)(c) and (d) (1956, reenactment 1985).[23] His conscious decision not to disclose both his dual role and the true status of the structure being purchased, represents an intentional concealment of material facts, upon which the plaintiffs reasonably relied. *Holmes v. Bateson*, 434 F.Supp. 1365, 1387 (D.R.I.1977), *aff'd in relevant part*, 583 F.2d 542 (1st Cir.1978) (citing *Home Loan and Investment Association v. Paterra*, 105 R.I. 763, 255 A.2d 165 (1969)). These wrongful concealments constitute the type of conduct contemplated by R.I.GEN. LAWS 7–12–43(1)(c) and (d) as a basis for

removing DiMartino from the AAA partnership, and it is so ordered.

### DAMAGES

Based on all of the above rulings, the plaintiffs are entitled to recover damages for: (1) partial failure of consideration, (2) breach of paragraphs 3 and 6 of the warranties letter, and (3) fraudulent misrepresentation concerning both the completeness of the building and the status of the Electric Boat rental option. Plaintiffs claim as damages, the cost of completion of the unfinished units, lost rental profits, and punitive damages.

In Rhode Island, the appropriate measure of calculating damages depends upon whether the damage to realty was permanent or temporary. *Tortolano v. Difilippo*, 115 R.I. 496, 502–503, 349 A.2d 48, 52 (1975); *Greco v. Mancini*, 476 A.2d 522, 526 (R.I.1984). "[T]he general rule is that where the damage is temporary the cost of repair measure is proper and where the damage is permanent, the diminution in value measure is more appropriate." *Tortolano, supra*, at 349 A.2d 52. Here, the defendants' failure to complete the building caused, at most, a temporary or partial impairment to the value of the plaintiffs' property, which the reasonable cost of repair measure will appropriately remedy. The parties stipulated that $30,000 was the amount actually expended by AAA to partially complete the building, and $23,500 was estimated by Voccola to finish the job, broken down as follows: HVAC $12,500, electrical $3,000, carpentry $5,000, drainage correction $3,000. These two figures total $53,500. "When the amount of damages is uncertain, the trier of fact may make reasonable inferences from the facts

---

**21.** The partnership agreement was signed on November 15, 1984, just prior to the closing.

**22.** DiMartino sent Bready and Papitto the completed pro forma statement on or about October 22, 1984, which listed Papitto, Bready, DiMartino and DiMartino's father Albert, as "Middletown Associates."

**23.** **7–12–43 Dissolution by decree of court—** (1) On application by or for a partner, the court shall decree a dissolution whenever:

. . . .

(c) A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business,

(d) A partner wilfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him.

in evidence in computing damages." *Melton v. United States*, 488 F.Supp. 1066, 1075, n. 35 (D.D.C.1980) (citing *Tatum v. Morton*, 386 F.Supp. 1308 (D.D.C.1974)). Considering all the evidence, we find that $53,500 is a fair estimate of the cost of completion.

The plaintiffs are also entitled to recover rental profits lost to vacancy on account of the unfinished units, if they can be established by reliable evidence. *Urico v. Parnell Oil Co.*, 708 F.2d 852, 856 (1st Cir. 1983). We are aware of two methods for proving loss of profits: (1) the before and after theory, and (2) the yardstick test. *G.M. Brod & Co., Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1538 (11th Cir.1985) (citing *Lehrman v. Gulf Oil Corporation*, 500 F.2d 659, 667 (5th Cir.1974), cert. denied, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975)). The before and after test applies when an ongoing business is damaged, and the court can look to the company's own business history to ascertain the lost profits. *Id.* The yardstick test is used in situations, such as the instant one, where, because of the newness of the business, the plaintiffs are unable to show an earnings record. In such cases, a comparison is made of the profits of a business similar to that of the plaintiffs (the "yardstick"), while providing allowance for any differences between the compared businesses. *Brod, supra*, at 1538–1539. Peter Scotti, a qualified real estate appraiser[24] testified that the projected net rent, less the actual rent is $101,650.[25] We find this figure to

be reasonable and well supported by the factors he considered in reaching his opinion, notwithstanding Voccola's contrary opinion.[26] Plaintiffs, therefore, are entitled to compensatory damages totaling $155,-150.

The plaintiffs also seek recovery of $380,000 they allegedly "put into" the property, but they have not met their burden of proof as to these damages. Neither Bready nor Papitto explained what this money was used for, and without reference to specific expenses, we are unable to determine whether these monies are duplicative of those being awarded for the cost of completing the building and lost rental profits, or whether they were used to pay for items unrelated to the defendants' breach, i.e. normal operating expenses, debt service, etc.

Lastly, the plaintiffs have requested that punitive damages be awarded, on account of the egregious conduct of the defendants. The imposition of such damages is within the sound discretion of the Court. *In re Walker*, 7 B.R. 216 (Bankr.D.R.I.1980). The conduct of both DiMartino and Marini was calculating and intentional. The plaintiffs were deliberately misinformed about the actual condition of the building, its non-compliance with applicable building codes, and the status of the EB rental option, in order to induce the sale. This kind of misconduct should be discouraged, to prevent its re-occurrence. Based upon the entire record, we find that the defendants' willful behavior requires the imposi-

---

24. Mr. Scotti, then a chief appraiser with H.W. Cook Co., *see* Joint Exhibit No. 64, has experience in the market for rental office space in Middletown. He handled the Aquidneck Green office and retail property in 1987, and has performed 10 appraisals in the area in recent years. Scotti based his opinion on a combination of factors: base rent per square foot ($9.00/s.f. for second level space and $8.00/s.f. for first floor units N–W), vacancy rate (1984—20%, 1985—15%, 1986—18%, 1987—20%) and actual rentals (1985—$222,750, 1986—$227,550, 1987—$246,-550).

25. Mr. Scotti calculated this figure by subtracting projected rents from actual rents.

Projected rents:
1985: $325,000 less 15% vacancy = $277,000
1986: $323,000 less 18% vacancy = $265,000

1987: $320,000 less 20% vacancy = $256,500

Actual rents:
1985: $222,750
1986: $227,550
1987: $246,550

Therefore, lost rental profits:
1985: $227,000 − 222,750 = $ 54,250
1986: $265,000 − 227,550 =    37,450
1987: $256,500 − 246,550 =     9,950
                  Total       $101,650

26. We reject Voccola's calculation of lost rental income totalling $231,566.55. Besides his questionable expertise in the rental office space market, we see no basis for his vacancy rate and inflation rate, which we find are unreasonably low and unreasonably high, respectively.

tion of punitive damages, which are assessed in the amount of $75,000. The plaintiffs' total damages therefore, are $230,150. The balance due on the November 15, 1984, promissory note is to be offset against this amount. Said damages are awarded against the defendant, limited partnership, Aquidneck Court Associates, and defendants Joseph DiMartino and Donald Marini, jointly and severally, in their individual capacities. This decision and order shall in no way be deemed or construed as a determination or adjudication of the rights and liabilities among and between the general and limited partners of Aquidneck Court Associates.